In the
United States Court of Appeals
For the Seventh Circuit

Nos. 98-4047, 98-4056, 98-4127, 98-4291

Lisetta Molnar,

Plaintiff-Appellee, Cross-Appellant,

v.

Lloyd Booth and East Chicago
Community School Corp.,

Defendants-Appellants, Cross-Appellees.

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:96 CV 259 JM--James T. Moody, Judge.

Argued September 24, 1999--Decided October 2, 2000

Before Bauer, Ripple, and Diane P. Wood, Circuit
Judges.

Diane P. Wood, Circuit Judge.  This appeal comes
to us from a jury's verdict in favor of plaintiff
Lisetta Molnar on her sexual harassment claims
against the East Chicago Community School
Corporation (East Chicago) and Lloyd Booth, the
principal of the junior high school where she
taught. She based these claims on both Title VII
and 42 U.S.C. sec. 1983. In addition to modest
awards of $500 each on the two theories, the jury
awarded $25,000 in punitive damages against Booth
and the court added $65,760 in attorneys' fees
against both defendants. The defendants' appeals
are based principally on the district court's
denial of their motions for judgment as a matter
of law under Fed. R. Civ. P. 50, though they also
complain about other aspects of the trial, the
fees, and (in Booth's case) the punitive damages.
Molnar cross-appealed from the court's decision
to grant judgment as a matter of law on part of
her sexual harassment claim. Finding no
reversible error in any of the court's decisions,
even taking into account the changed landscape
for sexual harassment claims after the Supreme
Court's decisions in Burlington Industries, Inc.
v. Ellerth, 524 U.S. 742 (1998), and Faragher v.
City of Boca Raton, 524 U.S. 775 (1998), we
affirm.

I

The account of the facts that follows presents them in the light most favorable to Molnar, for two reasons. To the extent we are considering the Rule 50 motions filed by Booth and East Chicago, we are obliged to view the facts in the light most favorable to the non-moving party--that is, Molnar. See Deimer v. Cincinnati Sub-Zero Products, Inc., 58 F.3d 341, 343-44 (7th Cir. 1995). To the extent we are reviewing the jury's verdict, we must view the facts in the light that supports its verdict. McCalpine v. Foertsch, 870 F.2d 409, 414 (7th Cir. 1989); LaMontagne v. American Convenience Prods., Inc., 750 F.2d 1405, 1410 (7th Cir. 1984). With respect to the jury instructions, evidentiary rulings, and disposition of attorneys' fees, our review of the district court's actions is essentially for abuse of discretion (though the specific standard for jury instructions cautions us to make sure that the law was fairly stated to the jury).

Molnar began working at Westside Junior High School, which was part of East Chicago, on August 22, 1994. She had been engaged to teach art classes as an intern, and she hoped to become qualified to be a full-fledged teacher at the end of her internship there. Booth was the principal of Westside.

On her first day of work, Booth ogled her and made appreciative noises. He took her into his office, closed the door, and put on music. He then suggested that he and Molnar had much in common and asked for her telephone number. During the same conversation, he told her that he could secure various benefits for her like a permanent art room--a "perk" that she, like other junior teachers, did not have--and supplies. She perceived all of this as a sexual advance, which made her uncomfortable.

For a time, Booth's unwelcome behavior continued. Over the next three to four weeks he called Molnar down to his office on a regular basis during the class period set aside for planning. He discussed "personal things." She thought she saw him staring at her from outside her classroom on several occasions. He showed her a music room and a wrestling room as potential art rooms. He invited her onto his boat. He talked about how difficult it was to meet people and have relationships and discussed the threat of AIDS with her. Once he pulled his pants tightly over his crotch, making Molnar think he was calling attention to that part of his body. Molnar felt intimidated by Booth, but she rejected all of his advances.

Her spurning of him had rather immediate repercussions. Booth took back the art supplies he had given her, and all talk of giving her an art room evaporated. At one point Molnar asked the Director of Secondary Education for East Chicago, Charles Carter, for help in getting a room. When Booth learned of the inquiry, he became angry and told Molnar not to go over his head again.

Matters became worse at the end of the school year. In May 1995, Booth gave the Indiana Professional Standards Board an evaluation of Molnar's internship that could have been understood as failing her. He specifically failed her in two categories, but, in a contradictory move, he also signed the back of the form. Standing alone, the signature on the back of the form would have meant that she could get her license. On the other hand, the negative evaluation on the face of the form meant that she could not. The effect of the inconsistent feedback from Booth meant, according to Molnar, that she was not in a position to receive the license.

The rest of the evidence supports her view that the failing evaluation was a serious matter. Molnar learned of it in October 1995 when union officials told her about it. She asked them to file a grievance on her behalf complaining both about Booth's sexually harassing conduct and his retaliation when she rejected him by failing her. Around the same time, Booth learned that she was protesting the evaluation, and he warned her, "you don't know what you're getting yourself into."

The union officials followed through by informing the school administrators of Booth's harassing and retaliatory conduct. One School Board member testified that he had asked someone to look into the matter, but no one ever talked directly to Molnar, and in the meantime Booth continued to haunt her. At the Board meeting of November 27, 1995, union members formally presented her grievance. Nothing happened except Booth's reappearance in her classroom a week later, ostensibly to perform another evaluation. This prompted the union to institute a formal grievance proceeding. The Board scheduled a hearing for three weeks after the union's presentation, but no hearing ever took place. Instead, on December 27, the Board overturned the conclusion that she had failed her internship. It never made a decision on the sexual harassment charges, nor did it take any disciplinary action against Booth, who continued to serve as Molnar's principal for the remainder of that school year.

II

Molnar filed her complaint against Booth and East Chicago on August 15, 1996. She argued that East Chicago had violated both Title VII and sec. 1983, and that Booth had violated sec. 1983, through the sexual harassment she had suffered. The case went to trial, where both defendants moved under Fed. R. Civ. P. 50 for judgment as a matter of law. The district court granted the motions insofar as they sought to eliminate Molnar's claim based on "hostile environment" sexual harassment (a commonly recognized category before the Ellerth and Faragher decisions), but it denied them otherwise.

At the trial, over the defendants' objection, Molnar presented the testimony of Christine Kolavo, another woman who had served her internship under Booth's supervision. Kolavo testified that Booth had asked permission to call and date her, and that when she refused, he had discontinued his supervision of her and had asked Vice-Principal Donna Vega to take over. The defendants' objection was based on relevancy and potential prejudice; Molnar defended its admissibility on three grounds: that it was admissible to establish retaliatory intent, that it was proper to impeach Booth's testimony that he had never asked out any female employee and would never do so, and that it tended to show that East Chicago was on notice of Booth's behavior. The district court agreed that it was relevant to Booth's intent and not unduly prejudicial and on that basis admitted it.

The defendants also object to the court's instructions to the jury, which were obviously drafted before Ellerth and Faragher. The three instructions at issue, numbers 4-6, all relate expressly to Title VII liability and thus are relevant only to the claims against East Chicago. (Booth makes the erroneous statement in his brief that because he cannot be liable under Title VII, he should also be exempt from liability under sec. 1983. That is not true. See Wudtke v. Davel, 128 F.3d 1057, 1064 (7th Cir. 1997) (and cases cited there). Those three instructions as a whole clearly showed that the court was restricting the Title VII theory to East Chicago, as was proper. The remaining instructions make it clear that it was asking the jury to evaluate Booth's conduct only under sec. 1983.) East Chicago argues that the three instructions misstated both pre- and post-Ellerth and Faragher law and that this error independently requires us to reverse and remand for a new trial.

The jury found for Molnar on both her Title VII and her Equal Protection claims, awarding her

$500 in actual damages against East Chicago on the Title VII count and $500 against Booth and East Chicago on the sec. 1983 count. It also awarded her $25,000 in punitive damages against Booth on the sec. 1983 count. The district court entered judgment on the verdict on March 16, 1998. In response to Molnar's motion for costs and attorneys' fees, the court entered a final order on October 29, 1998, awarding attorneys' fees in the amount of $65,760 jointly and severally against Booth and East Chicago. Booth and East Chicago have appealed from the verdict and fee orders against them, and Molnar has taken a cross-appeal from the district court's Rule 50 order dismissing her hostile environment claims.

III

A.  Appeal of Booth and East Chicago

Our review of the district court's denial of the defendants' motions for judgment as a matter of law under Rule 50 is de novo. See Deimer v. Cincinnati Sub-Zero Products, supra, 58 F.3d at 343-44. In addition, it is particularly important here to acknowledge that we apply the law as it now is, including the Supreme Court's intervening decisions in Ellerth and Faragher. See Harper v. Virginia Dept. of Taxation, 509 U.S. 86, 97 (1993).

1.  Title VII

Although Booth's brief contains some references to Title VII, we reiterate for the sake of completeness the fact that the district court's instructions clearly indicated that it was not permitting Molnar to pursue a Title VII claim against Booth. This was correct, because an individual supervisor does not fall within the definition of the term "employer" for Title VII purposes. See, e.g., Bryson v. Chicago State Univ., 96 F.3d 912, 917 (7th Cir. 1996); Williams v. Banning, 72 F.3d 552, 555 (7th Cir. 1995). Thus, the jury was never invited to impose liability on Booth under Title VII, it never did so, and Booth has no grounds for complaining about any ruling of the district court on a Rule 50 motion that addressed his liability under that theory.

East Chicago, in contrast, was Molnar's employer and it was therefore potentially liable to her for a violation of that statute. The district court also denied East Chicago's Rule 50 motion seeking to keep from the jury Molnar's claim of sexual harassment. Viewing the evidence in the light most favorable to Molnar, and keeping in mind the Supreme Court's guidance in Ellerth and Faragher for these claims, we find no error in

the court's decision.

In Ellerth and Faragher, the Supreme Court established the standards that govern the liability of an employer for sexually harassing behavior of a supervisor toward a subordinate employee. The Court abandoned the prior distinction, for vicarious liability purposes, between so-called quid pro quo harassment and hostile environment harassment, in favor of a test that distinguished between cases in which the supervisor takes a tangible employment action against the subordinate and those in which he does not. Ellerth, 524 U.S. at 760-65; Faragher, 524 U.S. at 807. The employer's liability in all kinds of cases is determined under agency principles, as the Supreme Court has developed them.

In general, employers bear vicarious liability for the harassment committed by a supervisor, in accordance with the following rules as summarized in Faragher:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

524 U.S. at 807-08. Regardless of the vocabulary then in use, Molnar therefore had to have evidence in the record that, if believed by the jury, would have shown that she was suffering from sexual harassment. In addition, the question whether the harassment led to a tangible employment action was critical. If so, East Chicago was liable without more; if not, East Chicago was entitled in principle to the opportunity to show (1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that Molnar unreasonably failed to take advantage of any preventive or corrective opportunities provided by her employer or to avoid harm otherwise. Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807.

Though we consider it a close call, we conclude that Molnar did show a "tangible employment action," as the Court signaled that term should be understood in Ellerth. Citing with approval

the concept of "tangible employment action" used in this court's decision in Crady v. Liberty Nat. Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993), the Court highlighted indicia such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Ellerth, 524 U.S. at 761. We reaffirmed the Crady test in our post-Ellerth/Faragher decision in Ribando v. United Airlines, Inc., 200 F.3d 507, 511 (7th Cir. 1999). To similar effect, in Savino v. C.P. Hall Co., 199 F.3d 925 (7th Cir. 1999), we said that "[a] tangible employment action has to cause a substantial detriment to the plaintiff's employment relationship." Id. at 932 n.8.

The clearest tangible employment action shown in Molnar's evidence was Booth's confiscation of the art supplies he had given her--supplies the jury could have believed were necessary for her to be able to perform her assigned job. (Indeed, as we discuss below, the jury was specifically told in Instruction 6 that it had to find that Molnar's reaction to Booth's advances "affected tangible aspects of her employment." Its verdict for Molnar indicates that it did so find.) This deprivation was not something the School Board ever fixed. At least as a temporary matter, the negative evaluation Booth gave Molnar was also a tangible employment action; the jury could have believed that it spelled the end of a career for an intern. The mere fact that the evaluation was reversed more than six months later and Molnar's career put back on track does not diminish its importance during the time it lasted. To hold otherwise would mean that harassing supervisors could demote employees who rejected their advances with impunity, as long as they later reversed the demotion and restored the employees to their former positions. The short duration is naturally relevant to the degree of damage Molnar suffered from the evaluation, but the jury's verdict of $500 on this claim indicates strongly that the jury was aware of that fact too.

If, in the alternative, one were to dismiss the confiscation of supplies as insufficiently grave to amount to a tangible employment action, and one were to recharacterize the evaluation as a threat of a tangible action instead of a present detriment, we would turn to the other half of the Ellerth/Faragher test. Ordinarily, that would require a remand so that East Chicago could have the chance to prove its affirmative defense by a preponderance of the evidence. Remand is not necessary in all cases, however, as Faragher itself illustrates. In Faragher, after outlining its new affirmative defense, the Court concluded

that "[w]hile the City would have an opportunity to raise an affirmative defense if there were any serious prospect of its presenting one, it appears from the record that any such avenue is closed." 524 U.S. at 808. That was so because the district court had found that the City had entirely failed to disseminate its policy against sexual harassment to its beach employees, its officials made no effort to monitor the conduct of its supervisors, and the policy had no provision for bypassing the problematic supervisors when someone wanted to register a complaint. Id. The Court thus held as a matter of law that the City could not establish the affirmative defense.

On the alternate hypothesis that Molnar did not show a tangible employment action, we find the same to be true in the present record. East Chicago does not dispute Molnar's assertion that it had no policy specifically aimed at sexual harassment. The only relevant policy East Chicago puts forward as a potential basis for an affirmative defense is the general policy it had barring discrimination on the basis of race, color, or sex. That policy was not a sexual harassment policy: it did not provide any guidance as to what employees should do in the face of sexual harassment--it did not even mention or define sexual harassment. (It is not surprising, then, that Booth, various other East Chicago employees, and union officials offered uncontroverted testimony that they had no idea (or were extremely confused about) what sexual harassment was, and what they should do about it.) Like the City in Faragher, East Chicago thus could never show that it had exercised reasonable care to prevent and correct promptly any harassing behavior. It could not show that Molnar unreasonably failed to take advantage of corrective opportunities it provided, because it provided none. It did not investigate Molnar's grievance; it set a hearing for three weeks later, which was over twice the normal time limit, and then it did not conduct one. There was therefore enough evidence for Molnar to prevail on this view of the facts as well.

There is a certain amount of forcing a square peg into a round hole when we evaluate evidence and jury instructions that were organized and drafted under an earlier view of the law according to a later Supreme Court decision. Nonetheless, this is the task the Court has given us in Harper. In addition, since Rule 50 motions are reviewed de novo in any event, we are free to see if any rational jury could find in the non-moving party's favor. Here we have no trouble saying that the answer is yes, under the now-governing legal standards, and thus we find no

error in the district court's decision to submit the case to the jury.

Our review of the jury instructions on the Title VII claim, Instructions 4 and 5, is similarly influenced by later changes. Once again, the standard of review is a liberal one: we look at jury instructions only to determine if taken as a whole they were sufficient correctly to inform the jury of the applicable law. Maltby v. Winston, 36 F.3d 548, 560 (7th Cir. 1994). Even if the instruction contains errors or misguides the jury, the error is reversible only if a litigant is prejudiced.

Taken together with Instruction 6, we think that the jury instructions were adequate. After reciting the pertinent part of Title VII, Instruction 4 told the jury that "[a] plaintiff may establish a violation of Title VII by proving that she was threatened with or suffered adverse employment decisions for refusing unwelcome sexual advances. This type of claim under Title VII is called a claim of quid pro quo sexual harassment or sexual discrimination." So far, so good: Ellerth and Faragher permit both threats and actual adverse actions to be actionable (distinguishing between them only for purposes of the affirmative defense), and it has been clear since Meritor Sav. Bank F.S.B. v. Vinson, 477 U.S. 57 (1986), and Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993), that sexual harassment is encompassed within Title VII's prohibition against sex discrimination. Instruction 5 told the jury that it had to find for the plaintiff on each of four listed elements:

(1) the plaintiff was a member of a protected class.

(2) the plaintiff was subject to unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature.

(3) the harassment complained of was based on sex.

(4) that she suffered or was threatened with a materially adverse change in the terms or conditions of her employment as the result of her refusal to comply with the sexual requests and advances.

Again, even though these would in all likelihood not be the instructions that would be drafted today, given Ellerth and Faragher, they communicate the most important points to the jury.

It is the final paragraph of Instruction 6, however, that led us earlier to resolve our

doubts in favor of concluding that the jury found an actual tangible employment action. That instruction was a classic "quid pro quo" instruction, which told them that the employer (i.e. East Chicago) was strictly liable for quid pro quo harassment, which occurs when a supervisor uses his supervisory authority either by making submission to requests for sexual favors a term or condition of the individual's employment, or by making submission or rejection the basis for decisions affecting the individual. The instruction concluded as follows: "Defendant School Corporation, the employer, is thus responsible or liable for the action of plaintiff's supervisor in plaintiff's claim of quid pro quo sexual harassment if plaintiff Molnar proves, by a preponderance of the evidence, that her reaction to Booth's advance affected tangible aspects of her employment."

In our view, these instructions did not so signficantly misstate the law as to require vacation of this verdict and remand for a new trial. In fact, in emphasizing that the action had to be "based on sex," the district court anticipated the Supreme Court's later decision in Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).

## 2. Section 1983

East Chicago purports to challenge the jury instructions on both Title VII and sec. 1983, but its brief makes it clear that the only instructions it is attacking are 4, 5, and 6, which pertained only to Title VII and which we have already discussed. It also challenges the district court's denial of its Rule 50 motion on the sec. 1983 claim, arguing that the evidence did not show the kind of intentional discrimination that is necessary for a claim under the equal protection clause. Based on the evidence, however, we believe this was properly a question for the jury. For example, the lack of any policy addressed to sexual harassment was East Chicago's responsibility, not Booth's. Furthermore, East Chicago offers little in the way of argument in support of its claim other than analogies to Title VII. Thus, even if there were points unique to sec. 1983 that it might have developed, it did not do so, and we will not undertake that task.

As far as Booth is concerned, we have already noted his error in assuming that because he is not a proper defendant for Title VII, he cannot be held individually liable under sec. 1983. That mistaken premise forms the basis for most of the rest of his arguments, which point out various

alleged errors in the Title VII jury instructions. Once again, there was evidence in the record on which the jury was entitled to rely, and we see no reversible error in the district court's decision to submit the case to them.

### 3. Admission of Kolavo Testimony

As we noted earlier, Christine Kolavo testified at trial on Molnar's behalf. Kolavo was a former employee whom Booth had supervised. She recounted an incident in which Booth had followed her out to her car and asked for her telephone number. Kolavo refused to give it to him and then reported the "come on" to Assistant Principal Vega. Vega then offered to supervise Kolavo directly. Kolavo did not make any report to the general school administration.

The defendants argued that Kolavo's testimony was irrelevant and prejudicial; Molnar responded that it tended to show either Booth's retaliatory intent or his discriminatory motive, that it impeached Booth's testimony that he had never asked out a person under his supervision and would not do so, and that it gave East Chicago notice of Booth's conduct. The district court, whose decision here we review only for abuse of discretion, admitted it, and did not give an instruction telling the jury it could be considered only for impeachment.

We are not impressed with the argument that this evidence gave East Chicago notice about Booth's behavior, especially because Kolavo herself did not alert the administration to the incident. Nor does it show anything about retaliatory intent, either with respect to Kolavo herself or with respect to Molnar. Discriminatory motive, or more accurately modus operandi, comes closer to the mark. Rule 404(b) allows the admission of evidence of other acts if it tends to prove facts like intent, preparation, and absence of mistake. Booth's effort to establish a sexual relationship with Kolavo (which was the way she saw it) suggests that he intended to do the same with Molnar and that he was not accidentally engaged in behavior that could be misconstrued. This was not the entirety of what Molnar needed to prove, but the request for sexual favors was a piece of the evidentiary puzzle, and as such, evidence tending to make the existence of that fact more probable was admissible. See also Fed. R. Evid. 401. In addition, and perhaps even more clearly, the evidence was admissible for impeachment purposes. The fact that no limiting instruction to that effect was given was the defendants' own fault,

as they never requested one.

Finally, even if the Kolavo evidence would have been better left out (that is, even if the district court's decision to allow it was an abuse of discretion), we find that the error was harmless. See Fed. R. Evid. 103; 28 U.S.C. sec. 2111. Both defendants took advantage of ample opportunities at trial to argue that Booth's actions toward Kolavo were not discriminatory and that East Chicago did not derive any notice from them. Furthermore, the evidence did not report shocking behavior; it was about a simple social request that the listener found inappropriate and that was rebuffed. The jury was thus able to place this one piece of evidence in its proper perspective.

4.  Punitive Damages Against Booth

Booth claims that the jury's award of $25,000 against him was excessive, because there was insufficient evidence for it to find that he had the requisite scienter to support punitive damages. Unfortunately, he has done little to preserve this point properly. He never moved for judgment as a matter of law on punitive damages, nor did he move for a new trial after the jury returned its verdict and the trial court entered its order. Never having asked the district judge to fix this problem, it is too late in the day to ask us to do so.

At least in this procedural posture, we find nothing reversible here. Under Kolstad v. American Dental Ass'n, 527 U.S. 526 (1999), a defendant must behave with malice or reckless indifference in order for a court to impose punitive damages on him. Id. at 535. The terms "malice" and "reckless indifference" "pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Id. The Court specifically rejected an additional "egregious misconduct" requirement that the court of appeals had engrafted onto the statute.

The events here took place in 1994, long after the law of sexual harassment had become well established by the Supreme Court. The jury could have found that Booth (the relevant actor here, since we are considering only the sec. 1983 theory) acted with malice or reckless indifference toward Molnar, particularly after she rejected his advances. Booth also attacks the amount of the award, $25,000, as grossly excessive. We realize that this is a significant amount of money for an individual, but as a matter of law $25,000 is not so far out of line

that it must be reduced. We upheld a similar punitive damages award in Merriweather v. Family Dollar Stores of Indiana, 103 F.3d 576, 581 (7th Cir. 1996), another sexual harassment case. Assuming as we must that the jury believed Molnar's account and not Booth's, this award is not "monstrously excessive."

## B.  Molnar's Cross-Appeal

Molnar's cross-appeal focuses on the district court's dismissal of her "hostile environment" theory of sexual harassment. But, just as we had to evaluate the verdict in her favor under current Supreme Court law, we must evaluate this part of the case under the current law as well. Many of the facts Molnar put forth fit more comfortably under the old "hostile environment" rubric than they did under the "quid pro quo" classification: facts like Booth's habit of standing outside her classroom and ogling her, calling her to his office continuously, and persistently asking for her telephone number to the point where she started avoiding the lunchroom and common areas lest she find him there. But Molnar was able to introduce this evidence at the trial, and jury instructions 4 and 5 allowed the jury to consider threats as well as actions. Even though instruction 6 called for the jury to find an effect on "tangible" aspects of her employment, the fact is that the jury did so. Molnar would have a stronger case for reversal if the jury had rejected her case under this arguably more demanding standard. The loss of the chance here to present more squarely to the jury the question whether the harassment was sufficiently severe or pervasive to amount to a hostile environment was unimportant given the way things worked out.

It would be pointless in our view to send this case back for a retrial on a theory that the Supreme Court has since rejected. Our review of this record satisfies us that Molnar was able to put before the jury all relevant evidence, and the jury was able as a practical matter to consider the very points it would look at under a proper Ellerth/ Faragher set of instructions. We therefore find no reversible error in the district court's grant of judgment as a matter of law on this part of her case.

## C.  Attorneys' Fees

The district court awarded $65,760 in attorneys' fees jointly and severally against both defendants. They assert that it abused its discretion in doing so (which is the proper

standard of review). We do not find the award to be so far out of line that it must be reconsidered. Molnar in the end walked away with $35,000 in total damages: $1,000 actual damages on the two counts, and $25,000 punitive damages. The fees are a little less than double that. In addition to winning her monetary award, she was also instrumental in causing East Chicago to institute a sexual harassment policy in the wake of her case.

East Chicago also argues that the fees should have been apportioned between the defendants, rather than being imposed jointly and severally, because the monetary award against it was so much smaller than the award against Booth. Again, even though this might have been reasonable, we do not find the district court's refusal to do so an abuse of discretion. When two or more defendants actively participate in a constitutional violation, they can be held jointly and severally responsible for indivisible attorneys' fees. See Herbst v. Ryan, 90 F.3d 1300, 1305 (7th Cir. 1996). A number of factors govern the decision whether to apportion or to use joint and several liability: the relative active or passive role each defendant played, fairness, and the goal of reimbursing private attorneys general. Id. Molnar's attorneys' fees were indivisible, because so many of the issues against the two defendants were the same or similar. As in Herbst, Booth could have been seen as an important moving force behind East Chicago's policies (or lack thereof at the pertinent time). This is enough, in our view, to keep the district court's decision within the bounds of its discretion.

IV

The judgment of the district court is Affirmed.