In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1508

GLORIA J. MOSHER,

Plaintiff-Appellant,

v.

DOLLAR TREE STORES, INC., a Virginia corporation,
and NICK LIMO, a/k/a Michael Paul Herman,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 2295--George M. Marovich, Judge.

Argued November 2, 2000--Decided February 16, 2001

Before MANION, KANNE, and EVANS, Circuit Judges.

EVANS, Circuit Judge.  This is a he-said/she-said case, where one party claims they shared a mutually beneficial, consensual relationship and the other alleges sexual harassment. Gloria Mosher, a part-time cashier at a Dollar Bills store (it's owned by the defendant, Dollar Tree Stores, Inc.) in Aurora, Illinois, claims she was sexually harassed by the store manager, Nick Limo, with whom she shared an apartment and a bed. Mosher allowed Limo to pay half her rent, accepted his gifts, met his parents, referred to him as her boyfriend, and continued their relationship for several months after she quit her job at the store. Nonetheless, she says that the 9-month relationship, during and after her employment, occurred against her will. Even giving credence to what she said, and viewing the facts in the light most favorable to her, we find that she fails to allege a claim for sexual harassment, and so we affirm the grant of summary judgment in favor of her employer. We also find Mosher's claims that the district judge was biased against her and abused his discretion when he denied her third request to extend discovery to be unavailing.\1

The tale begins in January 1997, when Mosher, who had not had a job for 11 years, took one as a part-time cashier at the Aurora store after

being hired by Limo, the store's manager. In her deposition, Mosher acknowledges that Limo helped her fill out the application form and handed her an employee handbook. However, later she contends that her memory grew hazy, and she could not recall whether or not she had actually received the handbook. Dollar Tree maintains that it had a policy and practice of distributing its employee handbook to all employees and that each store displayed an employment poster in the employee bathroom listing a contact number where employees could report harassment. Mosher denies ever seeing this poster.

After her first day of work, Limo asked Mosher out to dinner, and she accepted his invitation. She claims she went only because she thought that if she didn't, there might be problems on the job. However, she admits that at the time, Limo did not say anything that could be construed as threatening. At dinner, the two discussed job duties and how many hours Mosher would work. Mosher contends that Limo also told her that if she "played [her] cards right," she would "go places," but that he did not explain what he meant by this comment.

Mosher returned to work the next day. On her third day at work, during a break, Mosher left the cash register and went to the back of the store. There, Limo pulled her onto his lap and fondled her breasts. She protested, got up, and returned to the cash register. In addition, Mosher contends that Limo continued to ask her out to dinner after each of her shifts and frequently asked her "out of the blue" how she liked her job./2 She believed these questions were asked in a threatening manner.

Approximately 2 weeks after she started work, Limo asked for directions to Mosher's home, which Mosher provided, although she now contends that she did so under duress. Nevertheless, that evening Limo drove to Mosher's apartment. They had sex and he stayed the night. He returned the following evening and many nights afterwards, bringing with him a change of clothes. At the time, Limo was living at home with his parents, and he contends that Mosher and he agreed that he would start paying half her rent and would live with her.

Mosher admitted that Limo paid half her rent from March 1997 until their relationship ended in October of the same year. She also conceded that she accepted a check from Limo for clothes and that he bought a microwave and air conditioner for her apartment, which he left with her after their relationship ended. Although Limo paid half the rent, Mosher never gave him a key to the

apartment, but she let him in every time he called. The two also attended social functions together. Mosher acknowledged that she attended a birthday celebration at a local restaurant with Limo's parents and afterwards went to his parents' home for cake.

While at the Dollar Bills store, neither Mosher's work responsibilities, schedule, nor salary changed. Although Mosher alleges that she was forced to resign due to the harassment, she concedes that she never reported the situation to Limo's superior, the district manager Bill Rice. Early in her tenure, in February 1997, Mosher did speak with a new assistant manager, Richard Martin. She told Martin that she was upset and did not like her working conditions. Although she did not provide details, she did state that Limo was "after her."/3 Four months later, in the end of May, Mosher left her job at the Dollar Bills store. However, her sexual relationship with Limo continued for another 5 months, and he continued to pay rent.

After she resigned, Mosher accepted a higher-paying position at a clothing store a few blocks from the Dollar Bills store. Although she continued to work in the same shopping plaza, Mosher testified that Limo did not visit her in her new place of employment, nor did he attempt to contact her after their relationship ended in October.

From March 1997 onwards, while she was employed at the Dollar Bills store, Mosher was seeing two physicians, one for medication, Dr. Kris Gururajan, and the other for counseling, Dr. Stephen De Jaynes./4 Both doctors testified that during her visits Mosher reported that she had found employment, stated that she was quite happy with her new job, and that she had a new boyfriend./5 She did not tell either physician that she was afraid of losing her job or that she was subject to a harassing work environment.

We review the district court's grant of summary judgment in favor of Dollar Tree de novo. Doe v. Howe Military Sch., 227 F.3d 981, 990 (7th Cir. 2000). Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, admissions, and affidavits leave no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

In recent cases the Supreme Court abandoned the commonly used categories of quid pro quo and hostile work environment harassment, opting instead to distinguish between cases based on whether the supervisor took a tangible employment

action against the complaining subordinate and those cases in which no such action was taken. Burlington Indus. v. Ellerth, 524 U.S. 742, 760–65 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). In establishing the standards that govern vicarious liability of an employer for the harassing actions of an employee, we look to the agency principles developed by the Court. Ellerth, at 754-55; see also Molnar v. Booth, 229 F.3d 593, 600 (7th Cir. 2000).

Here, Mosher contends both that she suffered a tangible employment action and that she was subjected to a sexually harassing work environment. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761. Mosher was not fired. She quit and now claims to have been constructively discharged.

First, it should be noted that we have yet to determine whether a constructive discharge is a tangible employment action within the meaning of Ellerth and Faragher. Cf. Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 294 (2nd Cir. 1999) ("[C]onstructive discharge does not constitute a 'tangible employment action,' as that term is used in Ellerth and Faragher")./6 However, we need not settle that issue today, for we find that Mosher did not raise a genuine issue of material fact that she was constructively discharged.

An employee can assert a claim of constructive discharge when she is forced to resign because her working conditions, from the standpoint of the reasonable employee, have become unbearable. Lindale v. Tokheim Corp., 145 F.3d 953, 955 (7th Cir. 1998). Although an employee facing a discriminatory or harassing work environment is not required to file suit before resigning, failure to object to egregious conditions or to seek some form of redress is compelling evidence that the employee, or any reasonable worker, would not find the conditions intolerable. Id. Absent extraordinary conditions, "a complaining employee is expected to remain on the job while seeking redress." Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997).

Mosher admits that she never confided in anyone at the store. She never reported the situation to Rice, Limo's supervisor. At most, we can find that she spoke rather obliquely to a newly appointed assistant manager, Martin, early in her

tenure in February 1997. However, she did not resign until 4 months later in May. Thus, Mosher is unable to claim that incidents occurring in February-- such as being asked to dinner, questioned, or fondled-- were the triggering events that made it impossible for her to remain at the store. Rather, she bases her constructive discharge claim on a patchwork of contributing factors, including her living arrangement with Limo.

Mosher and Limo entered into a living arrangement and an ongoing sexual relationship shortly after she began working at the store. Mosher contends that this situation was entirely involuntary and that she agreed to it only because she needed to keep her job. However, the facts surrounding Mosher's relationship with Limo do not suggest an objectively hostile or abusive situation.

Mosher allowed Limo to pay half her rent for 9 months and regularly had sex with him. She never gave him a key, but rather allowed him into her apartment during each visit. She accepted his gifts, met his parents, and referred to him as her boyfriend. Although Mosher contends that subjectively she was afraid of Limo and had sex with him only in order to keep her job, her allegations are inconsistent with her actions. Not only did she not report the situation to management, but she never alerted her own counselor or physician. Rather, her report to both treating physicians was positive, indicating that she was engaged in a consensual relationship. Moreover, she did not attempt to rid herself of Limo. After she quit her job she took a new one only blocks away and continued to see Limo and have sex with him for another 5 months until their relationship ended in October. Finally, although Mosher contends that Limo was pertinacious, once their relationship ended, Mosher admitted that he never came to visit her in her new place of work or made any other attempt to contact her by phone or in person.

Overall, Mosher's passivity, her unwillingness to alert anyone or to change her living arrangement with Limo, are inconsistent with her claim that she was subject to an unbearable work environment and that her only option was to flee Limo by quitting her job. Thus, we find that Mosher was not constructively discharged.

Next, Mosher contends that she was subject to a hostile work environment. Because this claim does not involve a tangible employment action, Dollar Tree contends that in keeping with Ellerth and Faragher it is entitled to assert the affirmative defense that it exercised reasonable care to

prevent and correct any sexually harassing behavior and that Mosher unreasonably failed to take advantage of preventive or corrective opportunities. Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807. However, Dollar Tree's request is untimely. It failed to assert this defense below and cannot do so now. "We have long refused to consider arguments that were not presented to the district court in response to summary judgment motions." Cooper v. Lane, 969 F.2d 368, 371 (7th Cir. 1992). Thus, we consider only whether Mosher alleges facts consistent with a claim of hostile work environment and find that she does not as a matter of law.

In order to be actionable under Title VII, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. 775, 787. In determining whether an environment is sufficiently hostile or abusive we look at the totality of the circumstances, including but not limited to the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 787–88 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

The most significant and disturbing incident recalled by Mosher occurred on her third day of work when she says Limo pulled her onto his lap and fondled her breasts. While this readily could be considered a severe incident, Mosher's reaction suggests that she did not perceive it as such. At the time, she reported the incident to no one and within weeks was involved in what can only be reasonably described as a consensual sexual relationship with Limo which continued for many months. See Dey v. Colt Const. & Dev. Co., 28 F.3d 1446, 1454 (7th Cir. 1994) ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation.") (quoting Harris, 510 U.S. at 370).

Even viewing all the facts in the light most favorable to Mosher, no reasonable jury could conclude that she was anything other than a willing participant in a long, consensual relationship with her boss. Getting involved in a relationship like that is, for both an employee and a boss, usually unwise. But it happens. As long as men and women work together, the potential for sexual sparks to fly in the workplace will always exist. But after a long-

time sexual relationship like this one goes sour, it will be only the unusual case that can escape summary judgment. And this one is not that unusual.

AFFIRMED.


/1 Mosher did not file a motion to have the district judge recused but rather appears on appeal to be alleging judicial bias based on a letter sent by Judge George M. Marovich to both litigants. The letter invited both parties to provide the court with a candid assessment of their case including: whether the case could be decided by dispositive motions, the likelihood of success on the merits, the scope of damages, and what legal expenses would be incurred. In this case, both parties submitted responses, and Mosher contends that after receiving these ex parte communications the judge's attitude towards Mosher's case changed. First, we note that in litigious districts such as the one in Chicago, federal judges carry an unwieldy burden. Innocuous case management tactics such as Judge Marovich's letter are designed to help judges organize their trial schedules, promote settlement, and better serve the needs of the litigants that come before them. We find nothing improper in Judge Marovich's letter or his receipt of responses and find he acted well within his discretion. Finally, the court gave Mosher almost a full year to conduct discovery. Thus, we find the judge did not abuse his discretion when he refused to extend discovery for a third time, where Mosher claimed to have failed to obtain all of her own medical records.

/2 On appeal, Mosher submits new allegations of harassment which were not raised below. We limit our review to facts that were before the district court when it granted summary judgment. See Arendt v. Vetta Sports, Inc., 99 F.3d 231, 237 (7th Cir. 1996) (issues not raised in the district court are deemed waived).

/3 Dollar Tree's Attorney:  You said in your complaint that you complained about Mr. Limo to an assistant manager named Richard?

Mosher:  Yeah. I told him that I was upset, and I didn't like working under the conditions and, you know.

                    . . . .

Attorney:  What did you tell Richard?

Mosher:  I just said that I was unhappy, you know. I just came there

to work. I'm on Social Security. I'm a cardiac patient. I hadn't worked in 11 years. I moved to this place. I was paying X-amount more dollars than I did before, so I had to work. That's what it was.

. . . .

Attorney:  So you never confided in Richard. You never said that he's sexually harassing me, that he's forcing me to have sex, nothing like that?

Mosher:  I never confided in anybody in that store.

Attorney:  About anything?

Mosher:  No. It was rather embarrassing.

/4 Mosher provided her medical records to opposing counsel to substantiate her claim for emotional damages.

/5 Dollar Tree's Attorney:  Do you remember what she said about it?

Dr. Gururajan:  She said she got a job and she is quite happy about the work. In fact, if I remember right, I think she told me she hasn't had a job for a long time and she was happy that she got a job.

. . . .

Attorney:  Did she ever tell you she was in a relationship of any kind?

Dr. Gururajan:  She did tell me that she has a boyfriend . . . I asked her whether she talked about this to her counselor and she said she is planning to talk to him.

. . . .

Dollar Tree Attorney:  What did she say [about Limo]?

Dr. Stephen De Jaynes:  In general, that the relationship was positive and at one point, I believe, she had planned to move in with him. They were going to get an apartment together, I believe.

/6 The Second Circuit concluded that constructive discharge is not a tangible employment action, in part because even co-workers may be responsible for a constructive discharge and a constructive discharge is neither ratified nor approved by management. Caridad, 191 F.3d at 294.