In the
United States Court of Appeals
For the Seventh Circuit

No. 99-4018

John Wolf,

Plaintiff-Appellant,

v.

Northwest Indiana
Symphony Society,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 98 C 488--James T. Moody, Judge.

Argued February 14, 2001--Decided May 21, 2001


   Before Posner, Coffey, and Ripple, Circuit
Judges.

   Coffey, Circuit Judge.  On September 2,
1998, John Wolf filed suit against his
former employer, the Northwest Indiana
Symphony Society ("Symphony") pursuant to
Title VII of the Civil Rights Act of
1964, 42 U.S.C. sec. 2000e, et seq., and
the Equal Pay Act, 29 U.S.C. sec. 206(d).
Wolf alleged that the President and CEO
of the Symphony, Cheryl Cox, sexually
harassed him. Wolf also alleged that the
Symphony violated the Equal Pay Act
because it paid him less than similarly
situated female employees at the
Symphony. The district court granted the
Symphony's motion for summary judgment.
Wolf appeals, arguing that the district
court erred in granting summary judgment,
and also that the district court erred in
allowing a motion for summary judgment to
proceed even though he had outstanding
discovery motions pending and furthermore
had requested additional discovery before
the court ruled on defendant's summary
judgment motion, Fed. R. Civ. P. 56(f).
We affirm.

I.  FACTUAL BACKGROUND

   In 1989, John Wolf became a part-time
employee of the Symphony as its
Production Stage Manager, responsible for

all physical concert preparation./1 In 1994, the Symphony hired Cheryl Cox as President and CEO and she served as Wolf's direct supervisor. In a February 1995 evaluation, Cox gave Wolf a written evaluation that described him as "diligent," "self-motivated," "reliable," and "a rare find," among other similarly favorable descriptions.

Around the same time as Cox's evaluation of Wolf, Cox decided that to create a new position in the Symphony's organizational hierarchy and designated it as the "Operations Manager." The Operations Manager position would combine three part-time positions (Wolf's position as Production Stage Manager, Librarian, and Personnel Manager) into one full-time position. The Symphony's job qualifications recited that the compensation for the position would be "commensurate with experience, plus excellent benefits, with a salary range of $17,000 to $35,000." Further, the Symphony listed the qualifications for the position as:

Bachelor's Degree or similar musical experience working with orchestras. Applicants must be highly motivated, capable of managing multiple tasks, and should possess strong organizational, conceptual, and writing skills. Ability to work with musicians is essential. Computer experience a plus.

Wolf applied for the position, and on July 1, 1995, the Symphony hired him as the Operations Manager (though Wolf did not have a Bachelor's degree, he did have prior "experience working with Orchestras" due to his tenure as the Symphony's production manager). The Symphony offered Wolf a salary of $20,000 (a salary at the low end of the stated range because, in part, Wolf did not have a Bachelor's degree), and further provided health insurance benefits for him, but not for his family.

After he accepted the position, Wolf alleged that Cox began to sexually harass him. For instance, Wolf alleged that she told both Wolf and female Symphony employees that she treated men differently than women, from which Wolf inferred that Cox would discriminate against him. Further, Wolf alleged that Cox made comments such as "girls, we have

to watch ourselves. We have a man in the office now" and that she liked having "muscle in the office now." Wolf also claimed that Cox denigrated men and told him that men were untrustworthy. Beyond Cox's comments, Wolf also alleged that she repeatedly assigned him menial tasks--such as carrying boxes from her car, assembling office furniture, and dismantling an office Christmas tree--that were above and beyond the boundaries of his job responsibilities.

Wolf further was of the belief that Cox was desiring of creating a sexual relationship with him. In one instance, after Wolf discussed with Cox the question of whether he might be able to receive some overtime pay, she advised him that she would speak to the Symphony's finance director, and immediately thereafter allegedly informed him that she "hadn't been with a man in over six years." Sometime later, while at a luncheon, Cox gave Wolf her house keys and told him that he would "never know when [he] might need them." In addition, Wolf claimed that Cox once phoned him at home late at night and told him that she was sitting in the dark in her pink nightgown, in her king-sized bed, and was alone and afraid. Wolf took Cox's comments as an invitation to visit Cox at her house for the purpose of having a sexual relationship with her. According to Wolf, there were assorted other incidents, similar to those discussed above, in which he believed that Cox was inviting him to have sex with her. Cox never did explicitly request a sexual relationship with Wolf; nor did Wolf ever report Cox's allegedly harassing conduct to the Symphony's Executive Director (or anyone else in the Symphony for that matter) in accordance with the Symphony's published sexual harassment policy.

Sometime during the time frame in which Cox allegedly harassed him, Wolf discovered that the Symphony's female marketing director made approximately $10,000 more per year than Wolf did. Upset by the lesser compensation he was receiving Wolf, subsequently decided to resign and tendered a letter of resignation to Cox on January 11, 1996. Wolf did not mention that he was quitting because of any type of sexual discrimination, but instead wrote:

I gained the satisfaction of doing a job that everyone said could not be done and not only did I come to respect you as the best boss that I have ever had, but I came to love you as a dear friend. That's what is making this one of the hardest things I have ever had to do. Hard, but necessary. Please let this serve as my official resignation as Operations Manager of the [Symphony].

In August, I told you that I did not know how long I could stick it out at $20,000/yr. My paychecks just are not enough to pay the bills. This is a reality that I have to deal with. I have had our student loan payments deferred since July and now I must begin paying on them again. I know that this is awful timing. But I should have left much earlier. . . . This job has been so incredibly time consuming that I have been unable to do as much other part time work as I need to. Don't get me wrong, I love my job, but supporting my family and paying my bills has to be my #1 priority . . . .

In the past months, I have been insulted, demeaned, humiliated, and abused by Orchestra members and Bob [Vodnoy, the Symphony's conductor], a slimy do-nothing bastard who has done everything in his power to destroy this organization, was getting $70,000 to walk off into the sunset. . . .
However, Cheryl, I feel I owe it to you to be perfectly honest. I am aware that Anne is making nearly ten thousand dollars more than me plus the Society is paying for half of the health insurance for her family. Icannot tell you how deeply this has hurt me. Cheryl, I don't think that you can look me in the eyes and tell me that I am not as valuable to this organization as Anne is. . . . The more I think about it, the more upset I get. I told you before Cheryl that you were the only reason that I was sticking around . . . .

I am sorry these words come to you in the impersonal form of a letter, but right now I'm feeling a bit overwhelmed and I wanted to make sure that I said everything that I needed to. . . . I don't want anything to spoil our friendship. Both [my wife] and I are so fond of you, as are [our children]. I hope that we can still get together and

continue our relationship. I'm sorry it has come to this. I really am sorry.

Five days later, Cox sent Wolf a letter accepting his resignation. On January 27, 1996, Wolf wrote an eleven-page letter to all members of the Symphony's Board of Directors. Wolf initially explained that he resigned because he could not support his family on the salary he received. In the letter, Wolf also described his relationship with Cox, explaining that he viewed himself as her big brother and viewed Cox as a "dear friend." He commented that his children called her "Aunt Cheryl." But Wolf also explained that he was upset that Cox's "only response to [his] resignation was coldness and hostility.]" Wolf next complained about the Symphony's unfair employment practices--specifically that a female employee (the marketing director) made $10,000 more than he did and in addition received insurance benefits for her family. Finally, towards the conclusion of the letter, Wolf discussed Cox's actions that "made [him] feel awkward and uncomfortable," though he never expressed a belief that Cox had sexually harassed him. Wolf told the Board that Cox expected him to lie for her, cried in front of him, and told him "about how she wanted to crawl in her big king-sized bed in her nightgown or how she hadn't been with a man since her divorce six years ago." Wolf concluded the letter by stating that he was "conned" into believing Cox was his friend, that he was upset that Cox breached his confidentiality by sharing his letter of resignation with them, and further that he regretted the way things turned out and that he left the Symphony of his own volition.

Some two months thereafter, Wolf wrote another letter to the Board on March 21, 1996 and once again addressed the issue of his compensation, stating that the average salary for his position was $23,000 (pointing to the 1993-94 American Symphony Orchestra League ("ASOL") Salary Survey). Wolf made no reference to any type of sexual harassment in the March 21 letter.

On April 4, 1996, Wolf filed a charge of discrimination with the Indiana Civil Rights Commission, alleging that Cox had sexually harassed him. Thereafter, while

the charge was pending, Wolf wrote two additional letters to the Symphony's Board. In those letters, Wolf expressed an interest in resuming his position as Operations Manager, "provided that it was structured correctly and paid according to ASOL standards . . . ." Once again, Wolf made no reference to any allegations of sexual harassment in these letters. The Symphony again did not respond. On May 29, 1998, the Equal Employment Opportunity Commission denied Wolf's charge, and issued Wolf a right-to-sue letter. Thereafter Wolf filed suit, alleging that Cox had sexually harassed him and that the Symphony had violated the Equal Pay Act. The district court granted the Symphony's summary judgment motion, holding that Wolf had not submitted sufficient evidence from which a reasonably jury could infer that Cox's actions made his working environment intolerable. The district court further held that Wolf had submitted no evidence demonstrating that the Symphony had paid higher wages to similarly situated female employees.

## II. ISSUES

Wolf asserts that the district court improperly granted summary judgment in favor of the Symphony with respect to his Title VII and Equal Pay Act claims. Wolf further asserts that the court erred in ruling on defendant's summary judgment motion while Wolf's outstanding discovery motions were pending.

## III. ANALYSIS

### 1. Standard of Review

Summary judgment is proper if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "We review de novo a district court's grant of summary judgment, viewing the record in the light most favorable to the nonmoving party." Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1139 (7th Cir. 1997) (quoting Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1122 (7th Cir. 1994)). In order to successfully oppose a motion for summary judgment, the nonmoving party (in this case, Wolf) must do more than raise a "metaphysical doubt" as to the material facts. Id. (quoting Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., 475 U.S. at 587.

2. Wolf's 56(f) Motion

Both parties focus the majority of their arguments on the question of whether Wolf adequately moved under Rule 56(f) to extend discovery before the trial court ruled on the Symphony's motion for summary judgment. But if we accept all of the allegations in Wolf's complaint as true, and they still do not amount to an actionable Title VII claim, further discovery would be unnecessary. Wolf was certainly aware at the time of any type of sexual harassment he had allegedly endured. Although further discovery might have elicited a response from Cox regarding Wolf's allegations, we are unable to understand how further discovery would have uncovered any additional incidents of sexual harassment that might bolster his claims. Accordingly we initially turn to the question of whether Wolf's evidence, taken as true, could establish a legally sufficient basis to conclude that Cox sexually harassed him.

3. Title VII Claim

Title VII forbids any workplace discrimination "with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. sec. 2000e-2(a)(1). Recently, the Supreme Court abandoned the commonly used categories of hostile work environment harassment and quid pro quo harassment, opting instead to distinguish between cases in which the supervisor takes a tangible employment action against the subordinate and those in which she does not. See Burlington Indus. v. Ellerth, 524 U.S. 742, 760-65 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); see also Mosher v. Dollar Tree Stores, Inc., 240 F.3d 662, 666 (7th Cir. 2001); Gentry v. Expert Packaging Co., 238 F.3d 842, 846 (7th Cir. 2001); Molnar v. Booth, 229 F.3d 593, 599-600 (7th Cir. 2000); Hill v. American General Fin.,

Inc., 218 F.3d 639, 642-43 (7th Cir. 2000). An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. Hill, 218 F.3d at 642. The employer's liability in each instance is determined under agency principles, as the Supreme Court has clearly enunciated. Molnar, 229 F.3d at 600. In general, employers bear vicarious liability for the harassment committed by a supervisor in accordance with the following rules as summarized in Faragher:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence . . . . No affirmative defense is available, however, when, the supervisor's harassment culminates in a tangibleemployment action, such as discharge, demotion, or undesirable reassignment.

Faragher, 524 U.S. at 807-08.

   Thus, the question of "whether the harassment led to a tangible employment action is critical. If so, [the Symphony] was liable without more; if not, [the Symphony] was entitled in principle to the opportunity to show (1) that it exer cised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that [Wolf] failed to take advantage of any preventive or corrective opportunities provided by [his] employer to avoid harm otherwise." Molnar, 229 F.3d at 600 (citing Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807).

   A tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761; see also Molnar, 229

F.3d at 600 (citing Ellerth, 524 U.S. at 761); Ribando v. United Airlines, 200 F.3d. 507, 510-11 (7th Cir. 1999) (citing Ellerth, 524 U.S. at 761). "Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act." Ellerth, 524 U.S. at 762.

Here, Wolf was not terminated. He quit, and now claims to have been constructively discharged. First, it should be noted that we have yet to determine whether a constructive discharge is a tangible employment action within the meaning of Ellerth and Faragher. See Mosher, 240 F.3d at 666. We need not settle that issue today, however, for we find that Wolf did not raise a genuine issue of material fact that he was constructively discharged.

An employee can assert a claim of constructive discharge when he is forced to resign because his working conditions, from the standpoint of the reasonable employee, have become unbearable. Id.; Lindale v. Tokheim Corp., 145 F.3d 953, 955 (7th Cir. 1998). Although an employee facing a discriminatory or harassing environment is not required to file suit before resigning, failure to object to egregious conditions, or to seek some form of redress is compelling evidence that the employee, or any reasonable worker, would not find the conditions intolerable. Lindale, 145 F.3d at 955. Absent extraordinary conditions, "a complaining employee is expected to remain on the job while seeking redress." Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997).

We are of the opinion that Wolf's situation was far from the extreme situation warranting a resignation as the only alternative to avoiding or overcoming an intolerable situation. Although, perhaps, Cox's actions made Wolf uncomfortable, it is telling that in this case Wolf never reported Cox's harassment to anyone at the Symphony. Indeed, in his resignation letter, Wolf even commended Cox as being "the best boss he ever had." Even after Wolf had resigned and became upset with Cox, his complaints to the Symphony Board never

clearly stated that he believed that Cox had sexually harassed him; at best they only inferred a possibility of sexual harassment. Instead, Wolf's primary complaints to the Symphony Board regarded his pay and the manner in which Cox treated him after he submitted a letter of resignation. These are hardly the actions of an employee who is faced with an objectively intolerable working environment. As courts have noted, "'[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructivelydischarged.'" Yearous v. Niobrara County Mem'l Hosp., 128 F.3d 1351, 1356 (10th Cir. 1997) (quoting Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996)).

Wolf makes no other allegation that any of Cox's allegedly harassing activity resulted in a tangible employment action, but instead argues that, even if he did not suffer a tangible employment action, Cox subjected him to a sexually harassing work environment. Wolf points to several of Cox's actions in support of his sexual harassment claim, including: 1) making him perform menial tasks around the office; 2) informing him that she was glad there was "muscle" in the office; 3) telling Wolf on several occasions what she wore to bed; 4) phoning Wolf late at night to tell him that she was alone and scared; 5) informing him that she had not been with a man in six years; 6) holding his arm when he walked her to her car after work; 7) reserving a hotel room for Wolf and using the shower in that room before a concert; 8) telling him that men were untrustworthy; as well as other similar incidents.

To be actionable under Title VII, "the conduct at issue must 'ha[ve] the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.'" Filipovic v. K & R Express Sys., Inc., 176 F.3d 390, 397 (7th Cir. 1999) (quoting Saxton v. American Tel. & Tel., Co., 10 F.3d 526, 533 (7th Cir. 1993)). Further the conduct at issue must be sufficiently severe or pervasive such that "a reasonable person would find it hostile and [that] the victim [himself] subjectively sees as abusive." Id. (citing Ngeuntjuntr v. Metropolitan Life Ins. Co., 146 F.3d 464, 467 (7th Cir.

1998)). In determining whether conduct rises to the level, . . . we look at "the totality of the circumstances, including but not limited to the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Mosher, 240 F.3d at 668 (quoting Faragher, 524 U.S. at 787-88). We previously commented that "the concept of sexual harassment is designed to protect working women [and also men] from the kind of . . . attentions that can make the workplace hellish . . . . It is not designed to purge the workplace of vulgarity." Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995).

In Baskerville, we concluded that the plaintiff had not been sexually harassed where a supervisor called her a "pretty girl," made grunting sounds when she wore a leather skirt, told her that his office was not "hot" until she walked in, told her that "all pretty girls should run around naked" at work, and mentioned his wife's absence from town, stating that all he had for company was his pillow and looking at his hand as if to suggest masturbation. Baskerville, 50 F.3d at 430-31. In reaching this conclusion, we noted that the supervisor never touched the plaintiff, did not invite her (either implicitly or explicitly to have sex with him or go on a date with him), did not expose himself to her, and did not show her dirty pictures. See id. at 431; see also Gleason, 118 F.3d at 1144-45 (no sexual harassment where plaintiff's manager referred to female customers as "bitchy" and "dumb," ogled other female employees, flirted with plaintiff's female relatives, and told plaintiff that he spent the weekend at a nudist colony and that he dreamed of holding her hand); Weiss v. Coca-Cola Bottling Co., 990 F.2d 333, 337 (7th Cir. 1993) (no sexual harassment where plaintiff's supervisor asked plaintiff for dates, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs at her work station, and attempted to kiss her in a bar).

In this case, Cox's conduct is less egregious than the actions of the supervisors in Baskerville, Gleason, and Weiss. Cox never did make any explicit

comment to Wolf inviting him to have a sexual relationship with her. Perhaps Cox crassly let Wolf know that she was lonely, but only someone "mysteriously aloof from contemporary American popular culture in all its sex-saturated vulgarity" would find Cox's sexual overtures, if they even can be identified as such, substantially distressing. Baskerville, 50 F.3d at 431. Indeed, Wolf's reaction to her behavior belies any claim that he subjectively believed Cox harassed him. In his resignation letter, Wolf commended Cox as a good boss, and complained not about any sexual harassment, but instead about his pay. He also told Cox in the letter that he wanted to maintain their friendship. Later, when Wolf began to complain to the Symphony Board about Cox, he never did criticize her for sexually harassing him during his employment, but only for mistreating him after he had resigned (despite his complimentary resignation letter). Apart from being able to establish that a reasonable person would conclude that Cox's actions were harassing, Wolf's actions (first commending Cox and complaining about his pay, and later complaining about the way she treated him after he resigned) are inconsistent with his assertion that he subjectively believed Cox to have harassed him. Accordingly, the district court properly granted defendant's motion for summary judgment as to Wolf's Title VII claim.

4. Equal Pay Act Claim

Wolf also asserted that the district court erred in granting defendant summary judgment as to his Equal Pay Act claim. To establish a violation under the Equal Pay Act, Wolf was required to establish that: 1) different wages are paid to employees of the opposite sex; 2) the employees do equal work which requires equal skill, effort, and responsibility; and 3) the employees have similar working conditions. Bragg v. Navistar Int'l Transp. Corp., 164 F.3d 373, 378 (7th Cir. 1998). Wolf only cursorily discusses this issue in his brief on appeal, asserting that the Symphony provided health insurance benefits to female employees' family members. But the record establishes that the only employees who received benefits for family members were the "Finance Director" and the "Marketing

Director." Wolf concedes that these employees had different duties than he, and points us to no evidence in the record that their jobs required similar skill, effort, or responsibility. Accordingly, we hold that the district court likewise properly granted defendant's summary judgment motion as to Wolf's Equal Pay Act claim.

IV. CONCLUSION

Wolf failed to establish that a genuine issue of material fact exists in his employment discrimination claims. We agree with the district court's finding that the incidents of workplace harassment that Wolf alleges fail to rise to the level sufficient to come within the parameters of sexual harassment under Title VII. We further agree with the district court's decision that Wolf failed to present sufficient evidence to demonstrate that similarly situated female employees received greater compensation than he did, and thus the district court properly granted defendant's summary judgment as to Wolf's Equal Pay Act claim. Finally, we hold that Wolf's argument that the district court improperly ruled on defendant's summary judgment motion while his Rule 56(f) motion was pending is moot because, even accepting all of Wolf's allegations as true he could not establish a claim for sexual harassment. Accordingly, the district court's grant of summary judgment as to all counts is AFFIRMED.

FOOTNOTE

/1 Wolf's duties in this regard included moving of equipment for concert location changes, truck rental, and physical set-up for concerts.