In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3774

Lorene F. Murray,

Plaintiff-Appellant,

v.

Chicago Transit Authority
and David Mosena,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois.
No. 97 C 7923--Charles R. Norgle, Sr., Judge.

Argued January 16, 2001--Decided May 10, 2001


  Before Flaum, Chief Judge, and Coffey and
Rovner, Circuit Judges.

  Coffey, Circuit Judge.  On November 13,
1997, Lorene Murray filed suit against
the Chicago Transit Authority pursuant to
Title VII of the Civil Rights Act of
1964, 42 U.S.C. sec. 2000e, et seq., and
alleged that CTA President David Mosena
sexually harassed her and retaliated
against her for refusing his sexual
advances. She later added a 42 U.S.C.
sec. 1983 civil rights discrimination
claim against Mosena in his individual
capacity. At the conclusion of Murray's
case in chief, the district court orally
granted defendants' motion for judgment
as a matter of law, Fed. R. Civ. P.
50(a). Murray appeals, arguing that the
district court erred in granting
defendants' 50(a) motion and also erred
in various evidentiary rulings dealing
with her expert witnesses. We affirm.

I.  FACTUAL BACKGROUND

  Lorene Murray began working for the CTA
in 1979 as a staff attorney in the
corporate department. In 1992 Murray was
promoted to Senior Vice-President of
Legal Affairs. Her duties included
overseeing the day-to-day operations of
the Law Department's 116 employees. In
the fall of 1995, Murray received an
award for work relating to a financing

transaction she had put together that brought $50 million to the CTA. Around the same time, the CTA Chairman of the Board, Valerie Jarrett, addressed CTA's budget problems, issuing a policy that prohibited two CTA representatives from the same department from traveling to the same conference. Jarrett's policy, however, was never strictly enforced by then-CTA President Robert Belcaster.

But on September 3, 1996, Mosena, who had recently been hired as CTA President, issued a memorandum that placed a moratorium on the travel of all CTA Vice-Presidents, General Managers, and Managers, and stated that exceptions to the moratorium would be made only if "there is a compelling business reason." Three days after Mosena released his memorandum, CTA General Counsel William Farley informed Jarrett that he and Murray were both scheduled to speak at the annual meeting of the American Public Transit Association ("APTA"). Farley explained to Jarrett that his travel expenses would be "invoiced on the outside counsel line item," but that Murray's "would be taken out of CTA's 'travel' line item which currently is undergoing great scrutiny." Farley asked Jarrett for her thoughts on the matter, and she told him that Murray should speak with Mosena.

On September 23, 1996, Murray submitted a written request to Mosena for the CTA to pay her expenses in relation to the October APTA conference. Three days later, Murray met with Mosena and asked whether her paperwork for the conference had been completed. According to Murray, Mosena responded that he had her paperwork and asked if she were staying at the convention hotel. Murray told him that she was instead staying at the Disneyland Hotel, just down the block from the convention hotel. At this point, Murray alleged that Mosena said, "[w]ell, then you'll be able to have drinks and dinner with me." When Murray informed him that her husband and daughter were coming with her, Mosena told her that "[she didn't] understand. I want to have dinner and drinks alone with you." Unsure how to respond, Murray told Mosena that maybe she could make some arrangements. She claimed that Mosena then told her "you have to learn who the boss is around here," and that her travel request would

not be approved. Murray explained that she was a scheduled speaker, that the programs had been printed, that the trip had been arranged for some time, and that there was money in the budget for her to go. Mosena allegedly responded "maybe now you'll learn who the boss is."

Later that day, upset by Mosena's comments, Murray told her husband about the conversation with Mosena and her belief that Mosena had made a sexual advance, but she did not share her belief with any CTA official. Sometime later she told Farley that she could not attend the conference, but did not tell him any of the details of her conversation with Mosena. Farley spoke with Jarrett on Murray's behalf, but Jarrett told him that she would stand by Mosena's decision and that Murray would not be able to attend the conference. On September 30, Murray spoke with Mosena on the telephone and told him that she would attend the conference, but pay her own expenses. Mosena told her that he was glad she called and that it "would have been a whole lot cheaper [his] way."

After the conversations with Mosena, Murray claims that her working environment changed for the worse. For example, at an October 1996 vice president's meeting, Murray claimed that Mosena publicly ridiculed her by stating that "[she] handled the turnstile incident [in which a young boy caught his head in a CTA turnstile] the same way that Federico Pena had handled the Value Jet crash, and like him, [she] was going to be out of a job." Murray also alleged that, at the same meeting, Mosena announced that the law department would no longer attend the regular executive meetings. Murray, however, had never attended such meetings in the past, and no law department personnel, including Farley, attended these meetings thereafter.

Murray also alleged that Chairman Jarrett contributed to her worsening working environment. For instance, in January 1997, Jarrett instructed Farley to remove Murray from the committees on which she had been a member. Jarrett, however, testified that she told Farley that she wanted the lawyers to advise the committees, rather than sit on them as voting members. Later, after Farley left

the CTA as General Counsel, Jarrett hired Duncan Harris, who had previously worked with Jarrett and Mosena for the City of Chicago, without conducting interviews of any of the people Farley had listed as possible replacements, including Murray.

According to Murray, Harris also contributed to her deteriorating working environment. Murray claimed that in 1997 Harris cancelled a luncheon that Murray was scheduled to attend, took away her CTA-issued cellular telephone, reassigned her CTA-car to the CTA pool, and asked her to review cellular phone bills dating back to December 1995 and pay for her personal calls. It is interesting to note that the record reflects that Harris requested that all other law department personnel return their phones and cars and review their phone records as well. Further, Murray alleged that shortly after Harris became General Counsel, he stopped assigning work to Murray's husband, who worked for the CTA as a per diem attorney.

Murray claims as a result of Mosena's harassment (and subsequent retaliation against her), she became depressed, anxious, and even suffered from post-traumatic stress disorder ("PTSD")./1 Accordingly, she began a disability leave of absence on June 4, 1997. Prior to taking leave, Murray had told no one at the CTA that Mosena had sexually harassed her or retaliated against her for declin ing a sexual advance. Later in June, Murray's husband met with the CTA's outside counsel and told them of Mosena's harassment who thereafter investigated Murray's complaints. In July Murray filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging that Mosena had sexually harassed her between September 26, 1996 and May 13, 1997. Murray's complaint alleged three separate bases for recovery on her sexual harassment claim: 1) hostile work environment harassment; 2) quid pro quo harassment; and 3) retaliation for exercising a statutorily protected right to object to conduct prohibited by Title VII.

After the EEOC denied her claim and issued a right-to-sue letter, Murray timely filed this suit. Three days into the trial, during her case-in-chief, Murray attempted to introduce, under

Federal Rule of Evidence 804(b)(1), the deposition testimony of a psychiatrist, Dr. Leonard Weiss, who treated Murray in 1997 and 1998 to show that Mosena's sexual harassment had caused Murray's anxiety, depression, and PTSD. In support of the motion, Murray's counsel informed the district court that Dr. Weiss had been hospitalized and thus was unavailable for trial. Counsel, however, did not know where or for what Dr. Weiss had been hospitalized--indeed, counsel had been unable to locate Dr. Weiss altogether. The district court excluded Dr. Weiss's deposition testimony, noting that defendants had not had the opportunity to fully depose Dr. Weiss (in particular the defendants had not had a chance to depose Dr. Weiss concerning his report prepared and filed pursuant to Federal Rule of Civil Procedure 26, which had not been completed until after his initial deposition), and that the "suspicious circumstances" surrounding his unavailability would unfairly deprive defendants of the opportunity to cross-examine him regarding his credibility and the soundness of his opinions about the cause of Murray's PTSD. After this ruling, Murray moved to admit Dr. Weiss's Rule 26 report, but the district court denied this motion for largely the same reasons as it denied Murray's motion to introduce Dr. Weiss's deposition testimony. Without any testimony from Dr. Weiss on the cause of her PTSD, Murray's counsel then moved to use a rebuttal expert in the case-in-chief. The district court denied this motion as well, finding that the magistrate had not erred in limiting that expert's testimony to rebuttal.

Out of options to present expert testimony, Murray then moved for a mistrial because of her inability to present expert testimony and the district court denied this motion as well. At the close of Murray's case, the defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The district court granted defendants' motion, finding that Murray had not established that Mosena's conduct had been "sufficiently severe or pervasive to alter the conditions of [Murray's] employment." Murray appeals.

II.  ISSUES

On appeal Murray argues that: 1) the district court erred in granting defendants' judgment as a matter of law on all three counts; 2) the district court erred in its evidentiary rulings relating to the introduction of the testimony of her expert witnesses.

III. DISCUSSION

We review de novo the grant of a Rule 50(a) judgment as a matter of law. Massey v. Blue Cross-Blue Shield of Ill., 226 F.3d 922, 924 (7th Cir. 2000). Under Rule 50, a court should render judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed R. Civ. P. 50(a); see also Reeves v. Sanderson Plumbing Prod., Inc., 120 S.Ct. 2097, 2109 (2000). The standard for granting judgment as a matter of law "mirrors" the standard for granting summary judgment. Reeves, 120 S.Ct. at 2109 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)). Thus, as we examine the record in its entirety, we view the evidence in the light most favorable to the party against whom judgment was granted. Massey, 226 F.3d at 924.

In addition, we note that the standard of proof as to what constitutes sexual harassment under sec. 1983 is essentially the same as that under Title VII. See, e.g., King v. Board of Regents of Univ. of Wis. Sys., 898 F.2d 533, 537 (7th Cir. 1990); Bohen v. City of East Chicago, Ind., 799 F.2d 1180, 1186 (7th Cir. 1986).

A. Sexual Harassment Claims

Although Murray brought her claims under the commonly used categories of "hostile work environment" and "quid pro quo" harassment, we note that in Burlington Indus. v. Ellerth, 524 U.S. 742, 760-65 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998), the Supreme Court abandoned these commonly used categories, opting instead to distinguish between cases in which the supervisor takes a tangible employment action against the subordinate and those in which he does not. See also Mosher v. Dollar Tree Stores, Inc., 240 F.3d 662, 666 (7th Cir. 2001); Molnar v. Booth, 229

F.3d 593, 599-600 (7th Cir. 2000). The employer's liability in all kinds of cases is determined under agency principles, as the Supreme Court has enunciated them. Molnar, 229 F.3d at 600. In general, employers bear vicarious liability for the harassment committed by a supervisor in accordance with the following rules as summarized in Faragher:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence . . . . No affirmative defense is available, however, when, the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

Faragher, 524 U.S. at 807-08.

Thus, the question of "whether the harassment led to a tangible employment action is critical. If so, [the CTA] was liable without more; if not, [the CTA] was entitled in principle to the opportunity to show (1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that [Murray] failed to take advantage of any preventive or corrective opportunities provided by her employer to avoid harm otherwise." Molnar, 229 F.3d at 600 (citing Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807).

Here Murray contends that she suffered a tangible employment action and that she was subjected to a sexually harassing work environment. A tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761; see also Molnar, 229 F.3d at 600 (citing Ellerth, 524 U.S. at 761); Ribando v. United Airlines, 200 F.3d 507, 510-11 (7th Cir. 1999) (citing Ellerth, 524 U.S. at 761). "Tangible employment actions are the means by which

the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act." Ellerth, 524 U.S. at 762.

Murray argues that Mosena's refusal to approve her travel plan to the October APTA conference after she rejected his dinner invitation constitutes a tangible employment action. We have noted, however, that "not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that 'an . . . employee did not like would form the basis of a discrimination suit.'" Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996) (citation omitted). The isolated, and relatively minor, actions Murray alleged did not significantly affect her job responsibilities or benefits, and therefore, cannot be a "tangible employment action." See, e.g., Fyfe v. City of Fort Wayne, No. 00-1396, 2001 WL 171173, *4 (7th Cir. Feb. 22, 2001) (denial for reimbursement for travel and lodging expenses at seminar not an adverse employment action); Oest v. Illinois Dep't of Corr., No. 99-3883, 2001 WL 122111 (7th Cir. Feb. 14, 2001) (negative performance evaluations not adverse employment actions); Bell v. Environmental Prot. Agency, 232 F.3d 546, 555 (7th Cir. 2000) (cancelling a conference called by plaintiff and failing to greet her or speak to her were trivial matters that were not adverse employment actions).

Murray also argues that she suffered a tangible employment action when Jarrett failed to interview her for the General Counsel position and when Harris took away her cell phone, reassigned her CTA car to the car pool, and asked her to review her cell phone bills. But Murray has failed to tie these actions to the alleged sexual harassment by Mosena. Although Murray argues that the "extremely close and personal relationship between Mosena and Jarrett" supports an inference that they worked together to "make her life intolerable," her mere speculation is insufficient to establish that Mosena enlisted Jarrett (his own boss) and Harris to help him harass Murray. See, e.g., Miller v. American Family Mut. Ins. Co., 203 F.3d

997, 1008 n.9 (7th Cir. 2000) (plaintiff's "subjective belief that her supervisors knew her complaints . . . will not create the factual dispute needed to ward off summary judgment"); Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391, 401 (7th Cir. 1997) ("if the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed"). This court "has typically been skeptical of such elaborate plot theories." Konowitz v. Schnadig Corp., 965 F.2d 230, 234 (7th Cir. 1992). Further, many of the actions taken by Jarrett and Harris were merely policy changes that affected a large class of employees, and certainly were not directed toward Murray specifically. Accordingly, Murray failed to establish that she suffered a tangible employment action.

Murray also argues that, even if she did not suffer a tangible employment action, Mosena subjected her to a sexually harassing work environment and that the CTA is not entitled to the Ellerth affirmative defense. Murray alleged only two conversations with Mosena that could be viewed as sexual: 1) the September 26, 1996 conversation in which Mosena told her that he wanted "to have dinner and drinks alone with [her]." and 2) the September 30, 1996, telephone conversation in which he told her that it "would have been a whole lot cheaper his way."

To be actionable, "the conduct at issue must 'ha[ve] the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.'" Filipovic v. K & R Express Sys., Inc., 176 F.3d 390, 397 (7th Cir. 1999) (quoting Saxton v. American Tel. & Tel., Co., 10 F.3d 526, 533 (7th Cir. 1993)). Further the conduct at issue must be sufficiently severe or pervasive such that "a reasonable person would find it hostile and [that] the victim [herself] subjectively sees as abusive." Id. (citing Ngeuntjuntr v. Metropolitan Life Ins. Co., 146 F.3d 464, 467 (7th Cir. 1998)). In determining whether conduct rises to the level . . . ., we look at "the totality of the

circumstances, including but not limited to the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Mosher, 240 F.3d at 668 (quoting Faragher, 524 U.S. at 787-88).

Mosena's two dinner invitations arguably are not sufficient, in themselves, to constitute a sexually harassing work environment. See, e.g., DiCenso v. Cisneros, 96 F.3d 1004, 1008-09 (7th Cir. 1996) (holding that landlord's invitation for plaintiff to exchange sex for rent was not actionable sexual harassment under Title VII); Koelsch v. Beltone Elec. Corp., 46 F.3d 705, 707 (7th Cir. 1995) (holding that supervisor's comment that he could not control himself around plaintiff and two invitations to drinks and dinner did not poison the work place and rise to the level of actionable sexual harassment); Saxton, 10 F.3d at 533-34 (7th Cir. 1993) (two incidents of misconduct by supervisor involving inappropriate remarks and impermissible touching not actionable); Weiss v. Coca Cola Bottling Co., 990 F.3d 333, 337 (7th Cir. 1993) (co-worker's incidents of unwanted touching, attempts to kiss, and placing "I love you" signs in plaintiff's workplace did not create hostile work environment). Although the alleged "dinner invitations," which Murray construed as sexual invitations, may be potentially more serious than the types of harassment at issue in Koelsch, Saxton, and Weiss, "[c]ommon to all of these examples is an emphasis on the frequency of the offensive behavior." DiCenso, 96 F.3d at 1008. Had Murray complained more promptly or had there been additional "dinner invitations," we might very well have a different case. But Murray waited nine months before she raised the issue and there is no evidence that during those nine months, Mosena sexually harassed her or that her work environment was otherwise rendered objectively hostile. The undisputed facts establish that the CTA had adopted a sexual harassment policy (that included an autonomous department within the CTA to investigate complaints of sexual harassment) and that Murray failed to report any of Mosena's actions and thus had failed to take advantage of the CTA's

sexual harassment policy. In short, Murray "acted in precisely the manner a victim of sexual harassment should not act in order to win recovery." Shaw v. Autozone, Inc., 180 F.3d 806, 813 (7th Cir. 1999) (emphasis in original). Although Murray claims that she feared further harassment if she reported her actions, her "subjective fears of confrontation, unpleasantness, or retaliation do not alleviate [her] duty under Ellerth to alert the employer to the allegedly hostile environment." Id. Accordingly, Murray failed to establish a legally sufficient basis for a reasonable jury to conclude that Mosena sexually harassed her, and the district court's Rule 50(a) judgment was proper.

B.  Retaliation

   Murray also claimed that Mosena retaliated against her after she rejected his alleged sexual advances. Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he [or she] has opposed any practice made an unlawful employment practice [by Title VII]." 42 U.S.C. 2000e-3(a). To establish a prima facie case of retaliation under Title VII, Murray had to establish that "(1) she engaged in what our case law refers to as 'statutorily protected expression' (i.e. reporting or otherwise opposing conduct prohibited by Title VII, such as sexual harassment), (2) she suffered an adverse, job-related action by her employer . . . and (3) there is a causal link between her opposition to unlawful discrimination and [the adverse action]." Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1146 (7th Cir. 1997) (citing McKenzie v. Illinois Dep't of Trans., 92 F.3d 473, 483 (7th Cir. 1996)).

   Murray further contends that her rejection of Mosena's advances constituted a statutorily protected activity within the meaning of Title VII. But Murray cites no case law, and we were able to find no Seventh Circuit precedent, supporting the premise that the rejection of a sexual advance can serve as a statutorily protected activity for the purposes of establishing a Title VII retaliation claim./2 But we need not decide whether a plaintiff who rejects a sexual invitation from a supervisor has met the first element of a claim for

retaliation because, as discussed above, Murray failed to demonstrate that she suffered an adverse employment action. Accordingly, Murray did not present sufficient evidence to establish a prima facie case of discriminatory retaliation, and the district court properly granted defendants' Rule 50(a) motion with respect to Murray's retaliation claim.

## C. Evidentiary Issues

Murray's remaining issues relate to the exclusion of expert evidence of the psychological effects of Mosena's alleged harassment. This evidence, however, was only relevant to the issue of Murray's damages. Accordingly, because we hold that the district court's order granting the defendants' Rule 50(a) motion as to liability was proper, these evidentiary rulings are moot.

## IV. CONCLUSION

Murray has failed to establish that a genuine issue of material fact exists in her employment discrimination claim. We agree with the district court's decision holding that Murray has failed to establish that she suffered a tangible employment action when the CTA did not pay her travel expenses to the APTA conference. We further agree with the district court that Mosena's two alleged dinner invitations were insufficient to create an objectively hostile work environment and that, in any event, Murray, based on unreasonable assumptions, failed to take advantage of the CTA's policy for reporting sexual harassment. Accordingly, the district court properly granted defendants' Rule 50(a) motion as to all counts.

AFFIRMED.

FOOTNOTES

/1 Post-Traumatic Stress Disorder appears "after a physically or psychologically traumatic event outside the range of usual human experience, (e.g., a serious threat to one's life or seeing a loved one killed)" and is "characterized by symptoms of re-experiencing the event, numbing of responsiveness to the environment, exaggerated startle response, guilt feelings, impairment of memory, and dif-

ficulties in concentration and sleep."
Stedman's Medical Dictionary 1764 (27th ed.
2000).

/2 While we found no Seventh Circuit prece-
dent on the issue, we did find district
court opinions discussing whether the
rebuff of an advance can qualify as a
protected activity for purposes of a
retaliation claim. See Black v. City &
County of Honolulu, 112 F. Supp. 2d 1041,
1049 (D. Haw. 2000) (noting the division
of authority among district courts and
collecting cases).