In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4131

Diann Grube,

Plaintiff-Appellant,

v.

Lau Industries, Inc.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:99CV0593RM--Robert L. Miller, Jr., Judge.

Argued May 8, 2001--Decided July 19, 2001


   Before Bauer, Posner, and Coffey, Circuit Judges.

   Coffey, Circuit Judge.  On September 27, 1997, Lau Industries, Inc. asked Diann Grube to accept a transfer from her then-first-shift supervisor position to a second-shift supervisor position. But rather than accept the transfer, Grube resigned and sued Lau under 42 U.S.C. sec. 2000e, et seq., alleging that Lau had discriminated against her on the basis of her gender. The district court granted Lau summary judgment, holding that Grube had failed to establish either that she had suffered an adverse employment action or that Lau's non-discriminatory reasons for the shift transfer were pretextual. We affirm.

I.  Factual Background

   Grube began working for Lau on December 13, 1995, after Lau Industries purchased the Rochester, Indiana plant at which Grube had worked since 1969 and had been a supervisor since 1994. Grube's direct supervisor at all times relevant to this appeal was Dan Sullivan, the Manufacturing Manager at the Rochester plant. Lau hired Scott Marquardt to manage the plant in Rochester in July 1996.

   According to Grube, the event that

precipitated the discrimination was a medical leave of absence that she had taken to undergo surgery following an automobile accident. The facts in the light most favorable to the nonmovingparty, plaintiff-appellant Grube, are as follows. Grube underwent surgery on June 23, 1997, and her doctor advised her to remain on leave until August 28, 1997. For reasons not apparent in the record before us (and in any event not relevant to the disposition of this appeal) a nurse from Lau's Disability Management administrator contacted Grube's doctor's office on August 7 to obtain a release for Grube to return to work, accompanied by any restrictions the doctor recommended. Despite her doctor's earlier instruction for Grube to remain off work until August 28, the doctor's office did issue a release stating that Grube was able to return to work as of that date with some restrictions. Accordingly, after Grube was advised of the release, she reported to work on Monday, August 11. When Grube reported to work, she and Sullivan contacted her doctor to learn why she had been released to work earlier than expected. The doctor's office sent via facsimile a second release, which advised that Grube remain on leave until August 28, 1997, as originally instructed. When the release arrived, Sullivan was not in his office, so Grube placed the release on his desk and then left.

A short time later, Marquardt, the plant manager, found the second release. Marquardt contacted the doctor's office to attempt to resolve the conflict between the releases as to when Grube was able to return to work. Marquardt stated that he called the doctor's office because "it was unclear what was going on with her . . . [because] our office received one doctor's note which said [Grube] was able to return to work with restrictions, and then another note just a few days later which said that she could not return to work." Because Grube's doctor was on vacation, Marquardt did not receive an immediate explanation for the confusion, and ultimately Grube returned to work on August 28, as initially directed by her treating physician. According to Grube, it was at this time that Marquardt began to discriminate against her.

For example, on September 19, 1997, Grube alleged that Lau held a meeting of plant supervisors, during which Marquardt criticized Grube's department. Grube stated that she had not been properly notified about the meeting and so did not arrive "until the very end of [the] discussions, at which point in time [she] was unable to present her rebuttal to Marquardt's criticism of her department." At her deposition Grube testified that she felt excluded from the meeting because of her gender, and yet admitted that there were other women in attendance during the meeting. Grube also made clear that she was never disciplined in September 1997 because of problems in her department.

A few days later, during a September 24, 1997 meeting, Grube alleged that Marquardt commented about absenteeism among salaried personnel and concluded his remarks, stating that "[w]e're taking care of the problem." Although Marquardt did not mention Grube (or any other supervisor) by name, Grube believed that Marquardt's comments were directed at her because of her recent medical leave. Grube inferred from Marquardt's comment that his earlier attempt to contact her doctor had actually been an effort to coerce her to return to work earlier than she was able and in contradiction of the doctor's order. Grube, however, received no discipline or negative performance evaluation related to absenteeism.

Shortly after the September incidents in which Grube alleged Marquardt unfairly criticized her, Grube alleged that Marquardt put teeth into his words and requested that she transfer to the second shift. While Grube had been on leave, one of the supervisors on the second shift had resigned. Marquardt and Sullivan had met to determine which of the eight first-shift supervisors should be transferred to fill the open position on the second shift. Marquardt and Sullivan assessed, among other things, the strengths of each of the eight first-shift supervisors. Marquardt concluded that Grube was "not one of [Lau's] strongest supervisors," an assessment with which Sullivan agreed. Further, both Marquardt and Sullivan believed it critical to keep Lau's strongest supervisors on the first shift. In addition, Marquardt and Sullivan assessed

what impact moving each supervisor to the second shift would have upon the company's overall productivity. At the conclusion of their assessments, Marquardt and Sullivan agreed to transfer Grube to the second shift. To that end, Marquardt commented that Grube could "be more effective if she was placed on second shift, where her job would primarily be executing the production plans developed on first shift and handling people issues," rather than being responsible for the design of those production plans.

Sullivan met with Grube on September 27, 1997, to inform her that she was being transferred to the second shift. Grube resigned twenty minutes later. According to Grube, she resigned in part because transferring to the second shift would interfere with her ability to care for her husband, who was undergoing treatment for leukemia. Grube's husband, however, was working at the time and also no longer required in-home nursing care. In fact, the only daily medical care that Grube did provide for her husband was assistance in taking his medication.

After Grube resigned, Marquardt and Lau made several attempts to fill the open (2) supervisor positions. Initially, Lau promoted an employee from the first shift to the second shift supervisor position. But this employee failed to meet Lau's expectations as a supervisor and he was returned to his original position. Lau then conducted a search outside the company for a qualified supervisor, but was unable to hire anyone. Ultimately, Lau decided to reorganize its supervisory structure and, after streamlining operations, Marquardt felt that a second supervisory position on the second shift was unnecessary and eliminated the position.

Meanwhile, after receiving a right to sue letter from the Equal Employment Opportunity Commission, Grube timely filed this suit. She alleged five specific instances in support of her claim of sexual discrimination: 1) Marquardt's call to Grube's doctor's office; 2) late notification of a meeting where her department was criticized; 3) being singled out for absenteeism; 4) being reassigned to the second shift; and 5) Lau's refusal to provide a letter of

reference after she had resigned.

On October 30, 2000, the district court granted Lau's motion for summary judgment, finding that neither the criticism from Marquardt nor the transfer to the second shift constituted an adverse employment action and therefore Grube had not established a prima facie case of gender discrimination. In addition, the court concluded that even if Grube had established a prima facie case of gender discrimination she had not demonstrated that Lau's stated reasons for its actions were pretextual.

On November 28, 2000, the final day of the 30-day period for Grube to appeal the district court's judgment, Grube filed a Rule 56(g) motion, alleging that Sullivan had perjured himself by declaring that he was unaware of Grube's husband's leukemia until after her resignation. Shortly later on that same day, Grube filed a notice of appeal. On December 28, 2000, the district court dismissed Grube's 56(g) motion because it concluded that jurisdiction was properly before this court. Grube never filed a notice of appeal from the district court's December 28 order denying her 56(g) motion.

II. Issues

On appeal Grube asserts that the district court erred in granting Lau summary judgment on her gender discrimination claim. Next Grube urges that the district court erred in concluding that it did not have jurisdiction to hear her 56(g) motion.

III. Discussion

1. Standard of Review

Summary judgment is proper if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "We review de novo a district court's grant of summary judgment, viewing the record in the light most favorable to the nonmoving party." See Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1139 (7th Cir. 1997) (quoting Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1122 (7th Cir. 1994)). In order to successfully oppose a motion for summary judgment, the nonmoving party (in

this case, Grube) must do more than raise a "metaphysical doubt" as to the material facts. Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., 475 U.S. at 587.

We also review de novo the district court's determination that it lacked jurisdiction regarding Grube's Rule 56(g) motion. Manley v. City of Chicago, 236 F.3d 392, 396 (7th Cir. 2001).

2. Grube's Gender Discrimination Claim

Title VII forbids any workplace discrimination "with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. sec. 2000e-2(a)(1). A plaintiff who sues an employer under Title VII bears the burden of proving gender discrimination. One of the methods to accomplish this goal is to establish a prima facie case and apply the burden shifting method described in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

To successfully establish a prima facie case, Grube had to demonstrate that 1) she was a member of a protected class; 2) she performed her job satisfactorily; 3) despite the satisfactory performance she suffered an adverse employment action; and 4) Lau treated others outside the protected class more favorably than Grube was treated. See McDonnell Douglas Corp., 411 U.S. at 802. If Grube was successful in establishing a prima facie case of discrimination, Lau would then bear the burden of producing a legitimate nondiscriminatory reason for the adverse employment action. Christensen v. Equitable Life Assurance Soc. of the United States, 767 F.2d 340, 343 (7th Cir. 1985). If Lau has produced a legitimate reason, Grube would bear the ultimate burden of persuading the court that the reason given by Lau was merely a pretext for the employment action. Id.

To establish the third element of her prima facie case, Grube claims she was constructively discharged. An employee

can assert a claim of constructive discharge when she is forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable. Lindale v. Tokheim Corp., 145 F.3d 953, 955 (7th Cir. 1998). Absent extraordinary conditions, "a complaining employee is expected to remain on the job while seeking redress." Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997). As courts have noted, "'[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged.'" Ulichny v. Merton Comm. Sch. Dist., 249 F.3d 686, 704 n. 16 (quoting Yearous v. Niobrara County Mem'l Hosp., 128 F.3d 1351, 1356 (10th Cir. 1997)) (internal citations omitted).

Although her argument is not as clear as it might be, Grube seems to assert that Lau's request that she accept a transfer to the second shift in and of itself would have caused a reasonable employee to quit, and thus constituted a constructive discharge. In support Grube contends that a change in shift would have disrupted her life, pointing to her over twenty year tenure on the first shift. But were we to hold that a mere change in working hours would rise to the level of creating a condition so objectively unbearable as to allow an employee to quit and then bring a claim of constructive discharge, employers would be in a most precarious position in adapting and maintaining employee's work schedules to fit within the parameters of their business needs. While we have previously held that a transfer to another city to a position that seemed far from secure might support a claim of constructive discharge, Christensen, 767 F.2d at 342, Lau's decision to change Grube's working hours certainly does not rise to the level of an adverse employment action. Grube's pay and job title remained the same, and she suffered no significantly diminished job responsibilities. Grube offers little support, indeed she fails to offer a single citation to a case from any circuit, including ours, for the proposition that a mere transfer from a first to a second shift, unaccompanied by a reduction in pay or significantly diminished job responsibilities, can support a constructive discharge claim.

Instead, Grube offers only conjecture, rooted in stereotypes regarding the roles of men and women in the family, to support her position.

For instance, Grube asserts that Lau "preyed upon [her] wifely instincts" knowing that she would choose to quit so that she could take care of her husband rather than accept a transfer to the second shift. During oral argument Grube's counsel further suggested that we should infer that her transfer to the second shift was deliberately designed to make her working conditions intolerable because she could no longer be a dedicated wife and caregiver for her husband and because a female's income tends to supplement a family income, rather than provide the principal source of funds (and a male's income tends to be the primary family income). Such sweeping generalities do little to bolster her claim.

Indeed, were we to accept Grube's position, any transfer of a married female employee to a less desirable work assignment could serve as the basis for a Title VII claim. It certainly was not the intent of the United States Congress in enacting Title VII that it be so broad in scope. Further, Grube's position, it seems to us, is actually antithetical to Title VII's intended purpose of preventing workplace discrimination based on gender. In enacting Title VII, "'Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.'" Sheehan v. Donlon Corp., 173 F.3d 1039, 1045 (7th Cir. 1999) (quoting Sprogis v. United Air Lines, Inc., 444 F.2d 1194, 1198 (7th Cir. 1971)). Grube urges this court to take a position that, rather than eradicating gender stereotypes that pervade the workplace, instead reinforces them. That is because Grube's theory is itself based upon a gender-specific stereotype--that women should be the family caregivers and should remain at home during the evening hours. Quite simply, Grube's position that her transfer to the second shift can support a claim of constructive discharge is not tenable.

Grube also asks us to accept her theory that the transfer created an objectively intolerable working environment because

she needed to attend to her husband's medical needs. But the facts in this case tell an entirely different story. Although we in no way wish to disparage the seriousness of Grube's husband's illness, we note that he had returned to work by the time Lau requested Grube transfer to another shift. Additionally, Grube did not provide any medical care for her husband, other than helping to administer medication. At argument, Grube's counsel clarified that Grube's ability to provide caregiving for her husband was not at issue. Instead, according to Grube's counsel the proposed transfer to the second shift would have impacted the amount of "quality time" Grube could spend with her husband. As explained earlier, Title VII simply was never intended to be used as a vehicle for an employee to complain about the hours she is scheduled to work or the effect those hours have upon the time an employee spends with family members. Grube's transfer is not an adverse employment action and therefore she cannot show that she was constructively discharged.

Grube offers little other information, much less case law, to suggest that she suffered an adverse employment action. She alludes to the criticism she received at the September 19 meeting and the statements Marquardt made about absenteeism at the September 24 meeting. But as the district court properly noted, unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions. See Murray v. Chicago Transit Authority, No. 99-3774, 2001 WL 493433, *5 (7th Cir. May 10, 2001); Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998). Because neither the transfer to the second shift nor the negative comments Grube alleged were directed at her constitute an adverse employment action, Grube has not satisfied the third prong of the prima facie case.

Even if Grube was able to demonstrate that she had been constructively discharged, Lau offered a legitimate nondiscriminatory reason for the transfer, thus obligating Grube to demonstrate that Lau's proffered reason for the transfer--that Grube was the employee most well-suited for the second-

shift position--was pretextual. Pretext "means a dishonest explanation, a lie rather than an oddity or an error." Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681, 685 (7th Cir. 2000). "A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks." Id. at 684. In considering whether Lau's reasons for transferring Grube to the second shift were pretextual, "we bear in mind that the overall correctness or desirability of the reasons proffered is not relevant. . . ." Baron v. City of Highland Park, 195 F.3d 333, 341 (7th Cir. 1999). Instead Grube was required to establish that: "1) the proffered reasons are factually baseless; 2) the proffered reasons were not the actual motivation [for the decision]; or 3) the proffered reasons were insufficient to motivate [Lau's decision to transfer her.]" Id.

Grube makes several half-hearted attempts to demonstrate pretext, each of which are less than convincing. For example, Grube suggests and speculates without any substantiation in the record that she had incurred the wrath of Marquardt by standing up to him when she returned from leave and that Marquardt's decision to transfer her was in retaliation for her boldness. According to Grube, Marquardt's call to the doctor to resolve the confusion surrounding the two releases sent by the doctor's office was an effort on his part to force her to return to work earlier than her doctor had instructed. Grube contends that because she stood up to Marquardt, and did not return to work until August 28, as originally ordered, that he developed an animosity towards her, because he had been shown up by a subordinate female employee. Quite simply, Grube's speculation (and that is all that it is) cannot stand to demonstrate pretext. See, e.g., Miller v. American Family Mut. Ins. Co., 204 F.3d 997, 1008 n. 9 (7th Cir. 2000); Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391, 401 (7th Cir. 1997); Fairchild v. Forma Scientific, Inc., 147 F.3d 567, 574 (7th Cir. 1998); Hedberg v. Indiana Bell Tel. Co., Inc., 47 F.3d 928, 933 (7th Cir. 1995).

Next, Grube asserts that she was "targeted" for the shift transfer because two male employees, who like Grube had

recently returned from medical leave, were not transferred. Grube insists Lau needed a scapegoat to offer to the Union to appease their concerns regarding salaried-employee absenteeism. She claims that the fact that she was selected to be transferred, while neither of the two men who returned from medical leaves were similarly selected, demonstrates that Lau's reasons for transferring her were a sham. But there was only one position to fill, so only one (and not three) employees needed to be transferred. Without more, the mere fact that Lau chose Grube for the transfer, as opposed to two male supervisors, falls short of establishing pretext.

Finally, Grube suggests that Lau never ultimately filled the second-shift position after she resigned and therefore the proposed move was a pretext to force her to resign. But Grube again takes a shortcut through the facts. Conveniently, she ignores the fact that Lau did fill her position immediately after she quit by promoting a first-shift employee to the supervisory position. This employee did not perform as Lau expected and Lau returned him to his original position. Subsequently, Lau conducted an outside search for candidates to fill the position, but was unsuccessful. Only after these two attempts to fill the position did Lau reorganize its supervisory structure and eliminate the position Grube would have occupied.

In short Grube has failed to point to anything in the record that even remotely suggests that Marquardt and Sullivan did not honestly believe that transferring her to the second shift was the best alternative for Lau's open supervisory position. Therefore, even if Grube had established a prima facie case (which she did not), she did not demonstrate that Lau's proffered reason for transferring her was pretextual, and the district court properly granted summary judgment in favor of Lau.

3. Grube's 56(g) Motion

Grube also argues that the district court improperly decided it was without jurisdiction to hear her 56(g) motion, filed just before her notice of appeal. But Grube never filed a notice of appeal from the district court's December 28 or

der dismissing her 56(g) motion for lack of jurisdiction. Grube contends that she filed a notice of appeal from the final judgment and further briefed the substance of the 56(g) motion in her initial brief, and that should be sufficient. But a notice of appeal from a final judgment does not serve as a notice of appeal from all future district court orders. United States v. Hoover, 175, F.3d 564, 570 (7th Cir. 1999); see also Remer v. Burlington Area Sch. Dist., 205 F.3d 990, 994 (7th Cir. 2000) ("Compliance with the notice of appeal requirements of Rule 3 of the Federal Rules of Appellate Procedure is a prerequisite to appellate review"). Grube never filed a notice of appeal from the district court's December 28 order dismissing her 56(g) motion, and accordingly, we are without jurisdiction to review the district court's decision.

Even if we did have jurisdiction, it would matter little. It is also elementary that once a notice of appeal is filed with the district court it is divested of jurisdiction over the case, and the appellate court assumes jurisdiction. Kusay v. United States, 62 F.3d 192, 193 (7th Cir. 1995) ("the filing of a notice of appeal is an event of jurisdictional significance--it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal"). Once Grube filed her notice of appeal from the October 30 order, the district court was without jurisdiction to entertain her 56(g) motion. In any event, on the state of the record, we are forced to hold that Grube's position is without merit. Grube argues that she discovered, after the district court's summary judgment ruling, a witness who claims to have spoken with Sullivan about Grube's husband's illness. Sullivan declared earlier that he had not known of Grube's husband's illness. Grube contends that the statements are in conflict and therefore one of the parties must have committed perjury. But to constitute perjury, the false statement must concern a material fact. Marquardt, not Sullivan, made the decision to transfer Grube. What is more, Grube admitted that Sullivan had not discriminated against her. Not only is the alleged perjury not material, we fail to see that it is even relevant.

IV. Conclusion

We agree with the decision of the district court that Lau's proposed transfer of Grube from the first to the second shift, unaccompanied by any significant change in job responsibilities, pay or benefits, falls far short of constituting an adverse employment action. Accordingly, because Grube has failed to demonstrate that she suffered an adverse employment action, she has not established a prima facie case of gender discrimination. We also agree with the district court that even if Grube had established a prima facie case of discrimination she did not establish Lau's proffered reason for her transfer to be pretextual. Accordingly, the district court's grant of summary judgment in favor of Lau was proper. In addition, we hold that, because Grube failed to file a notice of appeal from the district court's December 28 order dismissing her 56(g) motion, we are without jurisdiction to review that decision. The decision of the district court is therefore AFFIRMED.