William MANSON, Plaintiff–Appellant,

v.

GENERAL MOTORS CORPORATION, Defendant–Appellee.

No. 01–4009.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 2002.

Decided April 4, 2003.

Before COFFEY, ROVNER, and WILLIAMS, Circuit Judges.

## ORDER

William Manson, an African–American employee of General Motors Corporation ("GM" or the "Company"), alleges that his employer: (1) discriminated against him on the basis of race in violation of 42 U.S.C. § 1981 (hostile work environment) and Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.* (disparate treatment); (2) retaliated against him for filing an EEOC charge in violation of Title VII; and (3) discriminated against him on the basis of a perceived disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Manson's discrimination complaints arose out of his ongoing conflict with four of his co-workers at GM. The conflict culminated on March 15, 1999, when Manson and his co-workers engaged in a very heated workplace confrontation, instigated by a comment made by Manson.

After meeting with the co-workers Manson confronted, GM became concerned and fearful that Manson might pose an immediate threat to workplace safety, and requested of Manson that he submit to a psychological evaluation. After undergoing the evaluation, Manson was deemed not to be a threat to the workplace and was allowed to continue to work at GM without restriction. The district court granted GM's motion for summary judgment on each of Manson's claims. We affirm.

**30**

## I. Background

William Manson began working in the Electro–Motive Division of GM in 1970. As of 1999, Manson was stationed in the Utilities Department as a maintenance mechanic. It was during this time frame that Manson began to experience problems with four of his fellow co-workers.

According to Manson, between January and March 1999, three of his co-workers "power-walked" past him two to three times per week, giving what Manson classified as being "sharp" and "intimidating" looks. Another co-worker allegedly gave Manson intimidating looks while standing near the plant's time clock. These co-workers, three of whom were Caucasian and one of whom was Hispanic, never touched or threatened him in any way.

Manson believed that the co-workers were upset with him, at least in part, because GM had announced that it was going to perform a performance review of the employees and he (Manson) felt that his co-workers blamed him for the impending study. Manson now contends that the co-workers who were allegedly harassing him were also motivated by racism. He also claims that there has been racial conflict amongst the workers at the GM plant where he worked for some 26 years.

On March 15, 1999, the tension between Manson and his four co-workers reached a boiling point. Manson approached three of the co-workers in the truck shop and asked them if they wanted to talk to him about the upcoming performance evaluation. According to Manson, they "screamed" at him and refused to discuss the matter, stating that he was "crazy." In an effort to diffuse the situation, the truck shop supervisor approached Manson and told him to " 'get out of [the area] ... You are causing a great disturbance down here.' " Manson Dep. at 79. As Manson "was walking away, [he] turned to [a fourth co-worker] and said, 'You are in it, too," and continued, " 'I am not afraid of you guys.' " *Id.* Manson admits that he "may have pointed [his] finger at the fourth co-worker," during the confrontation. *Id.*

Later that day, Manson's supervisor approached him regarding the incident; the supervisor informed Manson that he was in trouble because he had caused a disturbance. Manson responded by claiming that there was racial tension between him and the four employees, and that he wanted them to be "evaluated." Manson then discussed the truck shop incident with his union representative who, after speaking with the four co-workers, assured Manson that they would stay away from his work area.

In response to concerns voiced by the four employees involved in the confrontation, the truck shop's supervisor contacted Roger Kaspar, GM's senior administrator in charge of workplace safety and security. Kaspar met with the four workers, one of whom stated that Manson had remarked to his co-workers that he was a private investigator and that he was licensed to carry a gun. Believing that the employees were concerned for their own safety, Kaspar met with the truck shop supervisor, Manson's supervisors, and Manson's union representative to determine the appropriate course of action. Those present at the meeting agreed that Manson should visit with Dr. Lacey, the plant's physician, and, when alerted to the problem, Lacey agreed to meet with Manson.

On March 17, 1999, Manson's supervisor contacted him (Manson) over a two-way radio, and directed that he meet with Dr. Lacey immediately in the medical department. During his meeting with Lacey, Manson refused to discuss the truck shop disturbance. According to Dr. Lacey,

Manson was "very angry, very hostile," during this meeting, and eventually left the doctor's office after stating that he did not wish to discuss the matter. Manson was later advised by his supervisor that he was required to discuss the truck shop incident with Lacey, and that if he refused, he would be disciplined. Manson ultimately complied, and explained to Lacey the problems he had been having with his co-workers.

After evaluating Manson, Lacey concluded that, although he "demonstrated some signs of paranoia," Def. Facts Statement ¶ 38, Manson did not pose a danger to his co-workers at GM. *Id.* Lacey referred Manson to another doctor for a second opinion;[1] but Manson was permitted to continue to work at GM throughout the evaluation process. He was at no time suspended or placed on sick leave. And, after the evaluation process was concluded, GM placed no restrictions or conditions on Manson's continued employment with the Company.

Two days later, on March 19, 1999, Manson filed a charge with the EEOC, alleging: (1) racial discrimination in violation of Title VII; and (2) discrimination based on perceived disability in violation of the ADA. Several months after filing the charge, November 1999, Manson applied for a promotion to the position of assistant chief operating engineer, a salaried position in GM's Electro–Motive Division. After receiving Manson's application, Ms. Paula McGhee, one of GM's personnel department employees, notified the supervisor in charge of interviewing for the position that Manson was ineligible because he was an hourly employee. At the time, GM was not promoting hourly employees to salaried positions.[2] The position was thereafter filled by someone from the outside who had no work history with GM. Manson never heard anything further regarding his application.

Having received a right to sue letter from the EEOC, on March 20, 2000, Manson filed the present suit against GM, based on allegations of racial and disability discrimination. Manson amended his complaint two times and, in his second amended complaint,[3] alleged that by requiring him to meet with Dr. Lacey for a psychological examination, GM had violated both Title VII (disparate treatment) and the ADA (perceived disability). Manson also alleged that GM had subjected him to a hostile work environment, in violation of 42 U.S.C. § 1981, and, more recently, had retaliated against him on the basis of his having filed an EEOC charge, in violation of Title VII.

GM moved for summary judgment, and, finding that Manson had not demonstrated a prima facie case of discrimination on any of his claims, the trial court granted summary judgment to GM. Manson appealed.

## II. Analysis

### A. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment

---

1.  Each of the examining physicians agreed with Dr. Lacey that Manson was not a threat to his co-workers. Accordingly, after the examinations concluded, Manson thereafter continued to work at GM without restriction.

2.  According to Ms. McGhee's testimony, the reason for this policy was that GM wanted to avoid having to replace hourly employees because they were governed by a collective bargaining agreement. *Manson v. General Motors Corp.*, No. 00 C 1713, 2001 WL 1247644, at \*3 (N.D.Ill. Oct.17, 2001) [hereinafter *Manson I* ].

3.  For ease of reference, we will herein refer to the second amended complaint as the "Complaint."

may be granted if there remains no genuine issue as to any material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We review the court's grant of summary judgment *de novo* to determine whether, viewing the facts in the light most favorable to Manson, there remains a material issue of fact for trial. *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 679 (7th Cir.2002).

## B. Discrimination Claims

### 1. *Section 1981 Hostile Work Environment*

In his Complaint, Manson made a claim of hostile work environment under 42 U.S.C. § 1981.[4] Specifically, he alleged that GM harassed him through "unfair job assignments, derogatory remarks, and covert surveillance of [his] work" and that such racially-motivated harassment created a hostile work environment. Complaint ¶ 20. The trial court granted GM summary judgment on this claim, on the basis that allegations and facts of the alleged harassment did not rise to the level of "hostile work environment." *Manson I,* at *3. We agree.

To be actionable as a hostile work environment claim, harassment must be sufficiently severe or pervasive so as to alter the conditions of employment. *See Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1143–44 (7th Cir.1997). Thus, the conduct

giving rise to the hostile work environment claim must be both objectively and subjectively offensive so as to render the work environment "hostile" or "abusive." *See Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998); *Murray v. Chicago Transit Auth.,* 252 F.3d 880, 888–89 (7th Cir.2001).

On appeal, Plaintiff argues that the district court erred when ignoring his allegations of pre–1999 discrimination in resolving his hostile work environment claim. As the district court noted in its order, however, Manson "d[id] not address the limitations issue at all" in his response to the summary judgment motion, and in any event gave only "sparse treatment" of his pre–1999 allegations. *See Manson I,* at *6. By failing to raise the statute of limitations issue before the district court, Manson waived any argument that the district court should have considered events prior to his allegations of discrimination that occurred in 1999. *See Clay v. Holy Cross Hosp.,* 253 F.3d 1000, 1009 n. 8 (7th Cir. 2001).

Moreover, even considering Manson's harassment claims prior to 1999, summary judgment was still properly granted to GM. Manson's main evidentiary support for his claim that incidents prior to 1999 (the truckshop confrontation) created a hostile work environment was that, according to co-worker Robert Johnson, workers at GM had, in the past, made racially

---

4. The trial court noted that, in his response to GM's Summary Judgment Motion, Manson appeared to "meld" his hostile work environment claim to his claim of disparate treatment under Title VII. *Manson I,* at *3. The district court thus proceeded to address Manson's hostile work environment claim under Title VII. *Id.* at *4 ("Manson alleges two types of discrimination arising under Title VII:(1) a hybrid disparate treatment/hostile work environment claim; and (2) retaliation."). In his Complaint, however, Manson expressly pleaded his hostile work environment claim under

Section 1981, and it is well-settled that a plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Speer v. Rand McNally & Co.,* 123 F.3d 658, 665 (7th Cir.1997). Thus, the district court should have treated Manson's hostile work environment claim as it was pleaded-that is, as a Section 1981 claim. We do so on appeal, reaching the same conclusion as the district court; that Manson's hostile work environment claim fails as a matter of law.

derogatory comments, as well as having written derogatory graffiti in workplace bathrooms. *See* Johnson Dep. at 48 (stating that other workers have made racially derogatory comments for "26 years," although "not often"); *id.* ("You can go into the men's washroom and ... see these [derogatory phrases] on the walls ...").

■ Manson himself conceded that he never did hear a racially-derogatory slur directed at him, and thus he had no first-hand knowledge of such activity. Manson Dep. at 159–60.[5] And, although Manson claimed that another co-worker had told him that derogatory language had been used in reference to him, such third-hand allegations are insufficient to create a hostile work environment. *See, e.g., Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir.1997) (the fact that comments were not directed at plaintiff herself contributed to conclusion that they were merely "offensive" rather than objectively hostile).

Manson also claimed that his supervisors at GM were "constantly watching and peeping around different corners wherever I'd be working at ... [or] pop[ping] up unexpectedly," Manson Dep. at 151, and that such constant type of supervision created a hostile environment. Manson submitted no evidence that such behavior was unusual, however. And, given that the persons "monitoring" him *were* his supervisors, they were in all likelihood just doing their job. The record fails to disclose any evidence that their motivation for supervising Manson in such manner was related to his race.

■ Finally, Manson argued that his workplace was rendered hostile on account of his public confrontation with his co-workers and subsequent referral to the plant physician. We disagree with this

assessment. Federal civil rights laws do "not guarantee a utopian workplace, or even a pleasant one." *Vore v. Indiana Bell Tel. Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir.1994). And, although Manson did not always get along and had problems with his co-workers, we have no knowledge from the record that his co-workers acted in a hostile or abusive manner toward Manson. Indeed, there is no evidence that they laid a finger on Manson or threatened him in any way.

We note that, while there may have been an instance or two where less than desirable language was directed at Manson, we refuse to hold, based on this record, that the one or two instances where a co-worker told Manson "you're crazy" would rise to the level of what might be classified as a "hostile work environment." Instead, these comments appear to have been isolated instances, and fall far short of being inherently racial in nature, and thus did not support a finding of hostile work environment. *See, e.g., Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir.1999) (noting, with regard to comment such as "get your head out of your ass" and "dumb motherf-er" that "these verbal outbursts [do not] implicate negative attitudes toward African–Americans. It cannot be said with any degree of certainty that the character of these remarks was discriminatory.").

As for the evaluation performed by Dr. Lacey, although such process may have been somewhat unpleasant for Manson, it was entirely reasonable for GM to order the evaluation under the circumstances, considering that Manson's supervisor believed that he (Manson) might pose a threat to his co-workers' safety. Manson does not dispute that one of his co-workers

---

5. In addition, even Johnson, who made the allegations of racial tension at GM, admitted that such derogatory comments were "not often" made at GM. *Id.* at 48.

had alerted GM's senior manager for workplace safety (Kaspar) that he (Manson) had stated he was licensed to carry a gun. Def. Statement Facts ¶ 24. Manson further concedes that Kaspar, after hearing such statement, actually believed that Manson's co-workers were concerned for their own health and safety. *Id.* ¶ 25. Against the backdrop of Manson's confrontation with his co-workers in the truck shop, GM reasonably believed that Plaintiff posed a *potential* threat to workplace safety, at the time that it ordered Plaintiff to consult with Dr. Lacey.

Because we are convinced that Plaintiff's allegations of harassment in the workplace did not amount to a "hostile workplace" from the record before us, and because there was no evidence that the alleged "harassment" was racially motivated, the district court did not err in granting summary judgment against Plaintiff as to the hostile work environment claim.

### 2. *Title VII Disparate Treatment*

Manson contended that GM subjected him to an adverse employment action by failing to follow its practice of referring an employee to an investigating committee before sending him to the Company physician, and by failing to subject the other Caucasian and Hispanic employees involved in the dispute to the same treatment as he received. Manson also argued that his supervisor should not have told him to see the physician over a two-way radio, alleging that, by compromising the confidentiality of the communication, his supervisor caused him great humiliation and stigma.

Manson failed to present any direct evidence of discriminatory intent; thus, we proceed under the *McDonnell Douglas* burden shifting analysis. To demonstrate a *prima facie* case of employment discrimination under that test, Manson had to establish that: (1) he belonged to a protected class; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) his employer treated similarly-situated employees outside of his protected class more favorably. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Lenoir v. Roll Coater Inc.,* 13 F.3d 1130, 1132 (7th Cir.1994).

We have stated on prior occasion that, to demonstrate an adverse employment action, a plaintiff must have suffered "a materially adverse change in the terms and conditions of employment," and that such change must have been "more disruptive than mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993). Examples of adverse employment action include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indicia that might be unique to a particular situation." *Id.* While "conditions of employment that are designed to harass and humiliate employees because of their race are actionable employment actions," *Stockett v. Muncie Ind. Transit Sys.,* 221 F.3d 997, 1001 (7th Cir.2000), "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir.1996).

On appeal, Manson argues under *Stockett v. Muncie Ind. Transit Sys.,* 221 F.3d 997 (7th Cir.2000) (involving an employer-ordered drug test), that subjecting him to a psychological evaluation amounted to an adverse employment action on the part of GM. Manson correctly notes that, in *Stockett,* we stated that under certain circumstances, an employee drug test that is "not performed in a routine fashion ... but is

conducted in a manner that harasses or humiliates employees ... may be an adverse employment action ... under Title VII." *Stockett*, 221 F.3d at 1002. What Manson fails to mention is that we ultimately concluded that the drug test at issue in *Stockett* was *not* the type of harassing conduct that constitutes an adverse employment action, for the simple reason that the employer who had ordered the drug test had done so for good reason-namely, because "it had received a report that Stockett was using drugs ... [and an expert observer] had determined that Stockett exhibited the signs of a person ... under the influence of a controlled substance." *Id.*

■ Similar to the employer in *Stockett*, GM had good reason to order Manson's evaluation. Not only had a GM supervisor witnessed Manson cause a "great disturbance" in the truck shop, Manson Dep. at 17, another GM supervisor had been told that Manson had boasted he was licensed to carry a gun. Against such backdrop, *ordering Manson to be evaluated by GM's physician was *not* an adverse employment action; indeed, it was the most proper and reasonable course.

We cannot fault GM for taking this situation seriously, and refuse to hold that GM's handling of the situation constituted mistreatment of Manson, let alone the kind of racially-motivated persecution that he has alleged. Manson having failed to establish that he suffered an adverse employment action, his Title VII disparate treatment claim was properly denied by the trial judge. *See Lenoir v. Roll Coater Inc.*, 13 F.3d 1130, 1132 (7th Cir.1994)

(stating that a plaintiff must demonstrate all four prongs to establish a prima facie inference of discrimination).

### 3. Title VII Retaliation

Manson made a retaliation claim on the basis that some seven months after he filed a charge of discrimination with the EEOC, he was denied promotion to the position of assistant chief operating engineer. In Manson's view, GM's failure to promote him was in retaliation for his having filed the EEOC charge. To succeed on such claim, Manson had to establish that he was "engaged in statutorily protected expression, he suffered an adverse action by his employer, and there was a causal link between the protected expression and the adverse action." *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 755 (7th Cir.2000).

■ The record makes clear, as the district court correctly concluded, that Manson failed to demonstrate the third element of his retaliation claim. Manson provided no evidence to establish the requisite causal link between his failure to be promoted and his prior protected activity (the EEOC charge). Manson admits that his application was denied by a GM staff member (Paula McGhee) who had no knowledge that he (Manson) had filed an EEOC charge. Defendant's Stat. Facts ¶ 65, 67. And the evidence is unrefuted that McGhee denied the application because, as a matter of policy, GM was not promoting hourly employees to salaried positions at that time, *Id.* at 66;[6] *not*

---

**6.** Manson's bare allegation that he "learned that [two other hourly employees] had been promoted in 2000 to ... salaried personnel position[s]," Manson Aff. ¶¶ 5, 7, does *not* create a material issue of fact as to GM's promotion policy in place in November of

1999, the time at which Manson's application was denied. Accordingly, GM's evidence that it was not promoting hourly workers to salaried positions at the time that Manson applied for the assistant chief operating engineer is not in dispute.

because Mr. Manson had filed a charge with the EEOC. The trial court correctly concluded that Manson's retaliation claim failed as a matter of law, and we will not disturb its determination on this point.

### 4. ADA Claim

Manson made a discrimination claim under the ADA, alleging that GM "perceived" him as disabled under the ADA. Complaint ¶ 24. The ADA "forbids discrimination against '[a] person who has a record of, or is regarded as having, an impairment [but who] may at present have no actual incapacity at all.'" *Johnson v. Am. Chamber of Commerce Publishers, Inc.*, 108 F.3d 818, 819 (7th Cir.1997) (quoting *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 279, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)). To sustain his prima facie case of discrimination under the ADA, Manson had to establish all four elements of a prima facie claim: (1) that he was disabled within the meaning of the ADA (or "regarded as" disabled); (2) that his work performance met GM's legitimate expectations; and (3) that he suffered an adverse employment action; and (4) similarly-situated employees received more favorable treatment. *See Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001).

Manson admitted that he was not actually disabled, but claimed that GM "regarded him" as disabled, because his supervisors sent him for psychological evaluation. To be "regarded as" disabled, an individual must be regarded as having an impairment that substantially limits one or more of his major life activities. 42 U.S.C. § 12102(2) (defining "disability"). As found by the trial court, the evidence in the record did not support such a finding in Manson's case.

■ It is true that GM referred Manson for psychological testing. Such referral obviously was a legitimate attempt on the part of the employer to determine whether Manson was a danger in the workplace and whether he might assault someone at any time; concerns about Manson's emotional health arose after Manson incited the confrontation at the plant, and made a statement that he was licensed to carry a gun. As Manson has admitted, GM's physician concluded after the examination that Manson posed no such threat. And, although Lacey referred Manson to outside evaluators for additional testing, GM allowed Manson to continue working a full schedule throughout the period of his psychological testing, and compensated him for any work time he lost undergoing the testing itself. Def. Statement Facts ¶ 40 ("Plaintiff was paid by GM for the time spent [in the psychological evaluations], and was never suspended or placed on sick leave."). Furthermore, after the evaluations were concluded, GM placed no conditions on Manson's continuing to work at GM. *Id.* ¶ 42.

We held in *Krocka v. City of Chicago* that, "where inquiries into the psychiatric health of an employee are job related and reflect a 'concern [ ] with the safety of . . . employees,' the employer may . . . require that the employee undergo a physical examination designed to determine his ability to work.'" *Krocka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir.2000). Here, as in *Krocka*, it "was entirely reasonable, and even responsible," for GM to order Manson's evaluation, in light of his statement regarding the gun, and his confrontation with his co-workers. *Id.* Given this legitimate concern, the steps taken by GM to ensure workplace safety do not support a finding that GM regarded Manson to be disabled. There was thus no material issue of fact for trial on Manson's ADA

claim.[7]

Affirmed.

---

7. Nor does Manson's allegation that he was denied overtime create an issue of fact for trial. According to the regulations, a person's ability to work is "substantially limited," for the purposes of determining "disability" under the ADA, if he or she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). GM allowed Manson to work his full schedule without restriction; there is thus no evidence that it considered Manson unable to perform a broad range of jobs, or even his own job.

